RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0266p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ARNETIA JOYCE ROBINSON,

*Plaintiff-Appellant*,

*v.*

FEDERAL HOUSING FINANCE AGENCY; MELVIN L. WATT; THE DEPARTMENT OF THE TREASURY,

*Defendants-Appellees*.

No. 16-6680

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 7:15-cv-00109—Karen K. Caldwell, Chief District Judge.

Argued:  July 27, 2017

Decided and Filed:  November 22, 2017

Before:  BATCHELDER, GIBBONS, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:**  David H. Thompson, COOPER & KIRK, PLLC, Washington, D.C., for Appellant. Howard N. Cayne, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellees Federal Housing Finance Agency and Watt.  Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee Treasury Department. **ON BRIEF:**  David H. Thompson, Charles J. Cooper, Peter A. Patterson, Brian W. Barnes, COOPER & KIRK, PLLC, Washington, D.C., Robert B. Craig, TAFT STETTINIUS & HOLLISTER LLP, Covington, Kentucky, for Appellant.  Howard N. Cayne, Asim Varma, David B. Bergman, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellees Federal Housing Finance Agency and Watt.  Mark B. Stern, Abby C. Wright, Gerard Sinzdak, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee Treasury Department.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.   Appellant Arnetia Joyce Robinson is a stockholder in the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"; collectively, the "Companies").   During the economic recession in 2007–2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), which created an agency, Appellee Federal Housing Finance Agency ("FHFA"), and authorized FHFA to place the Companies in conservatorship.   The Companies, through FHFA as their conservator, entered into agreements with Appellee Department of the Treasury ("Treasury") that allowed the Companies to draw funds from Treasury in exchange for dividend payments and other financial benefits.   The Third Amendment to those agreements modified the dividend payment structure and required the Companies to pay to Treasury, as a quarterly dividend, an amount just short of their net worth.   The Third Amendment effectively transferred the Companies' capital to Treasury and prevented dividend payments to any junior stockholders, such as Robinson.   Robinson brought suit against FHFA, its Director, and Treasury, alleging that the Third Amendment violated the Administrative Procedure Act ("APA").   The district court found that Robinson's claims were barred by HERA's limitation on court action and that Robinson had failed to state a claim upon which relief can be granted.   We AFFIRM.

**I.**

Fannie Mae and Freddie Mac are for-profit, stockholder-owned corporations organized and governed by the federal government, pursuant to the Federal National Mortgage Charter Act, 12 U.S.C. §§ 1716–1723i, and the Federal Home Loan Mortgage Corporation Act, 12 U.S.C. §§ 1451–1459, respectively.   Private stockholders own and trade the Companies' securities.[1]

---

[1]We discuss here only the factual details that are pertinent to Robinson's claims.   For more in-depth discussion of the historical background of this case, please see *Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017), *petition for cert. docketed*, No. 17-580 (Oct. 18, 2017).

In 2008, during the economic downturn, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), Pub L. No. 110-289, 122 Stat. 2654 (codified at scattered sections of 12 U.S.C.), which created the Federal Housing Finance Agency ("FHFA") and authorized it to place the Companies in conservatorship or receivership under certain circumstances. HERA authorized FHFA as the Companies' conservator to "take such action as may be—(i) necessary to put the [Companies] in a sound and solvent condition; and (ii) appropriate to carry on the business of the [Companies] and preserve and conserve the assets and property of the [Companies]." 12 U.S.C. § 4617(b)(2)(D). HERA also detailed a "[l]imitation on court action," stating that, "[e]xcept as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator or a receiver." *Id.* § 4617(f). Moreover, HERA amended the Companies' charters to temporarily authorize Treasury to "purchase any obligations and other securities issued by the [Companies] . . . ." 12 U.S.C. §§ 1455(*l*)(1)(A), 1719(g)(1)(A). HERA also provided that the "Secretary of the Treasury may, at any time, exercise any rights received in connection with such purchases." *Id.* §§ 1455(*l*)(2)(A), 1719(g)(2)(A). The authority to purchase the Companies' securities expired on December 31, 2009. *Id.* §§ 1455(*l*)(4), 1719(g)(4).

FHFA placed the Companies into conservatorship on September 6, 2008, and one day later Treasury entered into materially identical Preferred Stock Purchase Agreements ("PSPAs") with each of the Companies. Under the original PSPAs, Treasury committed to provide up to $100 billion in funding to each of the Companies. In exchange, Treasury received one million shares of government stock[2] in each of the Companies and warrants to purchase 79.9% of the common stock of each of the Companies at a nominal price. Treasury's government stock had an initial liquidation preference of $1 billion for each company. Treasury's liquidation preference increased proportionately (dollar for dollar) to the amount that the Companies withdrew from Treasury pursuant to the PSPAs. In addition to the liquidation preference, the PSPAs provided that Treasury would receive a cumulative cash dividend equal to 10% of the

---

[2]Robinson refers to Treasury's "government stock" throughout her complaint and we adopt that convention to refer to the Variable Liquidation Preference Senior Preferred Stock granted to Treasury by the PSPAs.

value of the outstanding liquidation preference or an in-kind government-stock dividend.[3] The PSPAs prohibited the Companies from paying dividends on any securities junior to Treasury's government stock unless full cumulative dividends had been paid to Treasury for all current and past dividend periods.

On May 6, 2009, Treasury and the Companies, through FHFA, entered into the First Amendment to the PSPAs, which increased Treasury's total commitment to each of the Companies from $100 billion to $200 billion. On December 24, 2009, the parties executed the Second Amendment to the PSPAs, which again increased Treasury's funding commitment to the Companies. The Second Amendment established a formula that allowed Treasury's total commitment to each of the Companies to exceed (but not fall below) $200 billion depending upon any financial deficiencies the Companies experienced in 2010–2012 and any surplus existing as of December 31, 2012.

By August 2012 (and as of December 2015, the date the amended complaint was filed), the Companies had drawn approximately $187 billion from Treasury, and—including the initial $1 billion liquidation preference from each of the Companies—Treasury held a total of $189 billion in liquidation preference between the Companies. The Companies drew approximately $26 billion of that combined amount from Treasury to pay the 10% cumulative dividends owed to Treasury under the PSPAs.

The focus of this litigation is a third amendment to the PSPAs. On August 17, 2012, Treasury and the Companies, through FHFA, agreed to the Third Amendment, which replaced the previous dividend formula with a requirement that the Companies pay to Treasury a quarterly dividend equal to their entire net worth minus a diminishing capital reserve amount. Robinson refers to this portion of the Third Amendment as the "Net Worth Sweep."[4] The quarterly dividend payments do not reduce Treasury's outstanding liquidation preference or operate to

---

[3]The original PSPAs also provided that the Companies would pay to Treasury a quarterly periodic commitment fee to fully compensate Treasury for its ongoing financial commitment. Treasury had the option to waive the fee and repeatedly exercised that option. The periodic commitment fee was never requested under the PSPAs and never paid to Treasury.

[4]The Third Amendment also eliminated the requirement that the Companies pay a periodic commitment fee to Treasury.

otherwise redeem any of Treasury's government stock. The practical effect of the Net Worth Sweep is that the majority of the Companies' accumulated capital is delivered to Treasury each quarter, Treasury's liquidation preference and stock holdings remain the same, and private stockholders are even less likely to receive a return on their investment while the Net Worth Sweep is in place. Under the dividend structure in the Third Amendment, the Companies paid Treasury approximately $186 billion between the first quarter of 2013 and the final quarter of 2015. Had the Companies instead paid the 10% cash dividends detailed in the original PSPAs, the Companies would have paid Treasury approximately $57 billion over that same time period.

Robinson alleges that she has owned shares of the Companies' common stock since September 2008. Robinson argues that FHFA and Treasury agreed to the Third Amendment to "[e]xpropriate" private stockholders' investments and to "[e]nsure" that the Companies could not exit conservatorship. Specifically, she alleges that "[t]he Net Worth Sweep . . . unlawfully usurped nearly $130 billion from the Companies and sent it all into Treasury's coffers," and "plainly prevents the Companies from operating in a sound and solvent manner by prohibiting them from rebuilding their capital." Robinson also alleges that "FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury," abandoning its responsibility to act independently as the Companies' conservator.

## II.

In October 2015, Robinson filed suit in the United States District Court for the Eastern District of Kentucky, seeking declaratory and injunctive relief against FHFA, Melvin Watt (the Director of FHFA), and Treasury. She argued that the Third Amendment violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, because the Third Amendment exceeded FHFA's and Treasury's statutory authority under HERA and Treasury's conduct was arbitrary and capricious. Robinson requested (1) a declaration that the Net Worth Sweep portion of the Third Amendment violated HERA and Treasury acted arbitrarily and capriciously; (2) an injunction requiring Treasury to return all payments received through the Net Worth Sweep or to recharacterize such payments as a pay down of Treasury's liquidation preference and redemption of Treasury's stock; (3) vacatur of the Net Worth Sweep portion of the Third Amendment; (4) an injunction preventing FHFA and Treasury from enforcing the Net Worth Sweep; and (5) an

injunction prohibiting FHFA from acting on the instructions of Treasury and from re-interpreting its conservator duties under HERA.

Treasury filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of jurisdiction and failure to state a claim, and FHFA and Watt filed a separate but similar motion to dismiss on the same grounds. The district court granted both motions to dismiss, finding that Robinson had failed to state a claim upon which relief could be granted. The district court determined that Robinson's claims were barred by HERA, which prohibits courts from granting equitable relief affecting FHFA's conduct as a conservator, and that Robinson had not alleged that FHFA or Treasury acted beyond the scope of the statutory authority granted by HERA. Robinson timely appealed the district court's judgment.

**III.**

This court reviews de novo the dismissal of Robinson's APA claims. *See Latin Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 462 (6th Cir. 2014).

**A.**

HERA grants FHFA certain authority as the Companies' conservator, and it imposes certain limitations on review of FHFA's actions. As relevant here, it explicitly limits judicial review of claims that would hamper FHFA's conduct as a conservator: "[N]o court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator or a receiver." 12 U.S.C. § 4617(f). Our court has not previously construed this particular limitation, but this anti-injunction language is not new. Courts have interpreted nearly identical statutory language—found in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1821(j)—to bar claims for declaratory, injunctive, and other equitable relief against an agency acting within its statutory authority as conservator. Courts have construed this language to "effect a sweeping ouster of courts' power to grant equitable remedies . . . ." *Freeman v. F.D.I.C.*, 56 F.3d 1394, 1399 (D.C. Cir. 1995); *accord Courtney v. Halleran*, 485 F.3d 942, 948 (7th Cir. 2007); *Hanson v. F.D.I.C.*, 113 F.3d 866, 871 (8th Cir. 1997). The anti-injunction language in § 1821(j), however, "shields only 'the exercise of powers or functions' Congress gave to the [agency]; the provision does not bar injunctive relief when the

[agency] has acted beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions." *Sharpe v. F.D.I.C.*, 126 F.3d 1147, 1155 (9th Cir. 1997) (quoting *Nat'l Trust for Historic Pres. v. F.D.I.C.*, 995 F.2d 238, 240 (D.C. Cir.), *vacated*, 5 F.3d 567 (D.C. Cir. 1993), *reinstated in relevant part*, 21 F.3d 469 (D.C. Cir. 1994)); *accord Bank of Am. Nat'l. Ass'n v. Colonial Bank*, 604 F.3d 1239, 1243 (11th Cir. 2010); *Elmco Props., Inc. v. Second Nat'l Fed. Savings Ass'n*, 94 F.3d 914, 923 (4th Cir. 1996).

We conclude that this interpretation applies equally to HERA's anti-injunction language, found at 12 U.S.C. § 4617(f). *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 605–06 (D.C. Cir. 2017) (quoting *Freeman*, 56 F.3d at 1399), *petition for cert. docketed*, No. 17-580 (Oct. 18, 2017); *see also Cty. of Sonoma v. Fed. Hous. Fin. Agency*, 710 F.3d 987, 992–93 (9th Cir. 2013). "The plain statutory text [of § 4617(f)] draws a sharp line in the sand against litigative interference—through judicial injunctions, declaratory judgments, or other equitable relief—with FHFA's statutorily permitted actions as conservator or receiver." *Perry Capital*, 864 F.3d at 606. Claims that seek to "restrain or affect the exercise" of FHFA's powers or functions as the Companies' conservator are therefore barred by HERA. Like the limitation in § 1821(j), however, HERA's limitation on court action does not apply if a litigant properly alleges that "FHFA act[ed] beyond the scope of its conservator power."[5] *Cty. of Sonoma*, 710 F.3d at 992 (citing *Sharpe*, 126 F.3d at 1155). "[I]f the FHFA were to act beyond statutory or constitutional bounds in a manner that adversely impacted the rights of others, § 4617(f) would not bar judicial oversight or review of its actions." *Cty. of Leon v. Fed. Hous. Fin. Agency*, 700 F.3d 1273, 1278 (11th Cir. 2012) (citation omitted); *see Perry Capital*, 864 F.3d at 606.

A litigant's claims against Treasury are likewise barred if he or she seeks equitable relief that would restrain or affect FHFA's power as conservator. Although § 4617(f) specifically

---

[5]The district court below and the United States District Court for the District of Columbia recognized that FHFA may also be subject to suit if Treasury alone exceeded its statutory authority. *See Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208, 223 (D.D.C. 2014) ("[I]f FHFA, as a conservator or receiver, signs a contract with another government entity that is acting beyond the scope of its HERA powers, then FHFA is functionally complicit in its counterparty's misconduct, and such unlawful actions may be imputed to FHFA."), *aff'd in part, rev'd on other grounds, Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017). However, as discussed below, neither FHFA nor Treasury has exceeded its statutory authority, and we need not address whether § 4617(f) would bar Robinson's claims if only Treasury exceeded its statutory authority.

addresses FHFA, that provision also forecloses claims against Treasury that seek imposition of equitable relief that would restrain or affect FHFA's powers or functions as conservator. *Perry Capital*, 864 F.3d at 615–16; *see also Dittmer Props., L.P. v. F.D.I.C.*, 708 F.3d 1011, 1017 (8th Cir. 2013) (addressing anti-injunction language in FIRREA, 12 U.S.C. § 1821(j)); *Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 707 (1st Cir. 1992) (same). "[A]n action can 'affect' the exercise of powers by an agency without being aimed directly at [the agency]." *Hindes v. F.D.I.C.*, 137 F.3d 148, 160 (3d Cir. 1998).

Robinson's claims for equitable relief indisputably "restrain or affect the exercise" of FHFA's powers or functions as conservator. Robinson seeks declaratory and injunctive relief against FHFA that would effectively unravel the Third Amendment. She also alleges that by agreeing to the Third Amendment FHFA exceeded its statutory authority under HERA and, in turn, violated the APA. Therefore, to the extent that FHFA's agreeing to the Third Amendment is within the bounds of the statutory authority granted by HERA, Robinson's claims against FHFA are barred by HERA.[6]

Robinson's claims against Treasury are also barred by HERA, to the extent that Treasury acted within the bounds of its statutory authority by agreeing to the Third Amendment, because those claims also seek to unravel the Third Amendment. Thus, providing equitable relief on Robinson's claims against Treasury would have the exact same consequence—effectively undoing the Third Amendment—as would providing equitable relief on Robinson's claims against FHFA. "Accordingly, Section 4617(f)'s prohibition on relief that 'affect[s]' FHFA applies here because the requested injunction's operation would have exactly the same force and effect as enjoining FHFA directly." *Perry Capital*, 864 F.3d at 615–16 (alteration in original) (citing *Dittmer Props.*, 708 F.3d at 1017); *accord Collins v. Fed. Hous. Fin. Agency*, 254 F. Supp. 3d 841, 846 (S.D. Tex. 2017), *appeal docketed*, *Collins v. Mnuchin*, No. 17-20364 (5th Cir. May 30, 2017).

---

[6]FHFA and Treasury also argue that Robinson's claims are barred because HERA provides that FHFA "immediately succeed[s] to" Robinson's rights and powers as a stockholder in the Companies. 12 U.S.C. § 4617(b)(2)(A). The parties dispute whether this provision deprives Robinson of the right to bring direct and derivative claims regarding FHFA's conduct. The district court did not address this argument; because we find that Robinson's claims are barred by 12 U.S.C. § 4617(f), nor do we.

Robinson argues, nonetheless, that § 4617(f) is inapplicable because FHFA and Treasury exceeded the statutory authority granted them by HERA. We address Robinson's claims against FHFA and Treasury in turn.

**B.**

Robinson asserts that FHFA, by agreeing to the Third Amendment, exceeded its statutory authority under HERA in four ways: (1) FHFA failed to comply with its general statutory mandate to act as conservator; (2) FHFA, via the Third Amendment, improperly sought to wind down the Companies during conservatorship; (3) FHFA's agreeing to the Third Amendment placed the Companies in unstable business conditions; and (4) FHFA failed to act independently when it agreed to the Third Amendment.[7] None of Robinson's arguments on this matter is persuasive.

**1.**

Robinson first asserts that FHFA violated HERA's mandate to act as conservator of the Companies. Robinson relies on the traditional definition of "conservator" to support this argument, but she fails to demonstrate that the traditional understanding of conservatorship is relevant when determining whether FHFA exceeded its statutory authority under HERA. When Congress uses a term, we presume that Congress intended that term to have its established meaning. However, that presumption is inapplicable when the statutory language employed by Congress contradicts or conflicts with the customary meaning of that term. *See McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991). Robinson's argument—that Congress intended to give the term "conservator" its customary meaning—fails here because Congress explicitly delegated to FHFA conservator authority that exceeds the customary meaning of the term.

---

[7]Robinson also argues that the Third Amendment resulted from improper or duplicitous motivations on the part of FHFA. "Generally, '[i]t is not [the Court's] place to substitute [its] judgment for FHFA's.'" *Perry Capital*, 70 F. Supp. 3d at 226 (alterations in original) (quoting *Cty. of Sonoma v. Fed. Hous. Fin. Agency*, 710 F.3d 987, 993 (9th Cir. 2013)). As the district court explained, the § 4617(f) inquiry is limited to the contents of the Third Amendment, not why FHFA executed the Third Amendment or what FHFA has publicly stated about its role as the Companies' conservator or the Third Amendment. Therefore, we address only whether FHFA's actual conduct— that is, its agreeing to and conduct pursuant to the Third Amendment—exceeded its statutory authority.

First, FHFA is not a traditional conservator because Congress granted FHFA a broad array of discretionary authority. Rather than requiring FHFA to revive or rehabilitate the Companies (as a traditional conservator may be required to do), HERA expressly states that FHFA "*may*, as conservator, take such action *as may be*—(i) necessary to put the [Companies] in a sound and solvent condition; and (ii) appropriate to carry on the business of the [Companies] and preserve and conserve the assets and property of the [Companies]." 12 U.S.C. § 4617(b)(2)(D) (emphasis added). This language is permissive and, as the district court explained, details *powers* that FHFA holds rather than *duties* that FHFA must perform. A divided panel of the D.C. Circuit agrees. "[T]ime and again, [HERA] outlines what FHFA as conservator 'may' do and what actions it 'may' take. The statute is thus framed in terms of expansive grants of permissive, discretionary authority for FHFA to exercise as the 'Agency determines is in the best interests of the regulated entity or the Agency.'" *Perry Capital*, 864 F.3d at 607 (quoting 12 U.S.C. § 4617(b)(2)(J)). "It should go without saying that 'may means may.' And 'may' is, of course, 'permissive rather than obligatory.'" *Id.* (internal citations omitted).[8]

Second, FHFA is not a traditional conservator because the express powers granted to FHFA by HERA conflict with the customary meaning of the term "conservator." Specifically, HERA provides that FHFA as conservator may "take any action authorized by this section, which [FHFA] determines is in the best interests of the [Companies] or [FHFA]." 12 U.S.C. § 4617(b)(2)(J)(ii). HERA explicitly authorizes FHFA to consider its own interests when acting as the Companies' conservator. "That explicit statutory authority to take conservatorship actions in the conservator's own interest, which here includes the public and governmental interests, directly undermines [the plaintiff's] supposition that Congress intended FHFA to be nothing more than a common-law conservator." *Perry Capital*, 864 F.3d at 613 (quoting 12 U.S.C. § 4617(b)(2)(J)(ii)); *see also Saxton v. Fed. Hous. Fin. Agency*, 245 F. Supp. 3d 1063, 1076 (N.D. Iowa 2017), *appeal docketed*, No. 17-1727 (8th Cir. Apr. 4, 2017) ("Plaintiffs suggest that

---

[8]Judge Janice Rogers Brown dissented from the D.C. Circuit panel's holding in *Perry Capital*, explaining in a footnote that the panel majority placed too great an emphasis on Congress's use of the word "may" in § 4617. Instead, she reasoned: "Congress's decision to use permissive language with respect to a conservator's duties is best understood as a simple concession to the practical reality that a conservator may not always succeed in rehabilitating its ward." *Perry Capital*, 864 F.3d at 638 n.1 (Brown, J., dissenting).

FHFA's actions as conservator must achieve certain goals—namely, rehabilitation and a return to normal operations. Plaintiffs' suggestion is contradicted by HERA's text."); *Roberts v. Fed. Hous. Fin. Agency*, 243 F. Supp. 3d 950, 962 (N.D. Ill. 2017), *appeal docketed*, No. 17-1880 (7th Cir. Apr. 27, 2017) ("And here Congress did not set up a typical conservatorship. This is best evidenced by the fact that FHFA is empowered, in its role as conservator, to act in *its own best interests*." (citing 12 U.S.C. § 4617(b)(2)(J)(ii))). The plain language of HERA, instead, "endows FHFA with extraordinarily broad flexibility to carry out its role as conservator," far beyond that contemplated in a traditional conservatorship arrangement. *Perry Capital*, 864 F.3d at 606. Therefore, Robinson has failed to demonstrate that the customary definition of "conservator" is applicable here, or that FHFA must comply with the restrictions and duties of a traditional conservator when exercising its conservator powers under HERA.

**2.**

With respect to her second and third arguments, Robinson asserts that FHFA's agreement to the Third Amendment improperly placed the Companies in a financial position akin to that of liquidation. Under HERA, liquidation is a power unique to FHFA's role as a receiver. *See* 12 U.S.C. § 4617(b)(2)(E) (describing FHFA's "[a]dditional powers as receiver"). Robinson reasons, therefore, that FHFA exceeded its statutory authority because it acted as a receiver at a time when it was supposed to act as a conservator. However, HERA does not bar FHFA's decision as conservator to restructure the Companies' dividend payments to Treasury. Nor does HERA oblige FHFA as conservator to preserve certain capital. Robinson may disagree about the necessity or financial wisdom of the Third Amendment, but "Congress could not have been clearer about leaving those hard operational calls to FHFA's managerial judgment." *Perry Capital*, 864 F.3d at 607. FHFA's agreement to the Third Amendment is well within its statutory conservator authority.

HERA grants FHFA far-reaching powers to direct the Companies' business and to act on the Companies' behalf as conservator. HERA authorizes FHFA to "be appointed conservator or receiver for the purpose of reorganizing, rehabilitating, *or winding up* the affairs of [the Companies]." 12 U.S.C. § 4617(a)(2) (emphasis added). Specifically, HERA provides FHFA with "[g]eneral powers" to "[o]perate" and "conduct all business" of the Companies, take such

action as may be necessary to put the Companies in a "sound and solvent condition," "carry on the business" of the Companies, "preserve and conserve the assets and property" of the Companies, "transfer or sell any asset or liability" of the Companies, and "pay all valid obligations." *Id.* § 4617(b)(2).  HERA also grants to FHFA "[i]ncidental powers" to

> **(i)** exercise all powers and authorities specifically granted to conservators or receivers, respectively, under this section, and *such incidental powers as shall be necessary to carry out such powers*; and
> **(ii)** take any action authorized by this section, *which the Agency determines is in the best interests of the [Companies] or [FHFA]*.

*Id.* § 4617(b)(2)(J) (emphasis added).

FHFA's execution of the Third Amendment to the PSPAs falls squarely within its statutory conservator authority to operate the Companies, carry on business, transfer or sell assets, and to do so in the best interests of the Companies or *itself*.  HERA's language—that FHFA may take action that it determines is in the "best interests" of the Companies or FHFA, 12 U.S.C. § 4617(b)(2)(J)(ii)—is significantly different from the comparable language used in FIRREA, which states that FDIC may take action that it determines is in the best interests of "the depository institution, *its depositors*, or [FDIC]," 12 U.S.C. § 1821(d)(2)(J)(ii) (emphasis added). FDIC is instructed to take into consideration the depositors to the failed bank in receivership or conservatorship.  FHFA does not have a similar instruction to consider the best interests of the stockholders who invested in the Companies.  *See Perry Capital*, 864 F.3d at 607–08. "Renegotiating dividend agreements, managing heavy debt and other financial obligations, and ensuring ongoing access to vital yet hard-to-come-by capital are quintessential conservatorship tasks designed to keep the Companies operational." *Perry Capital*, 864 F.3d at 607; *see also Collins*, 254 F. Supp. 3d at 846 ("For the reasons set forth in *Perry Capital*, the arguments asserted by Plaintiffs here—the same arguments asserted by the plaintiffs in *Perry Capital*—fail to demonstrate that the FHFA's conduct was outside the scope of its broad statutory authority as conservator."); *Saxton*, 245 F. Supp. 3d at 1076 ("Plaintiffs' outcome-oriented interpretation of HERA therefore misses the mark.  HERA speaks to FHFA's powers as conservator, and such powers plainly allow for the actions contemplated by the Third Amendment.").

Robinson has failed to allege that FHFA's agreement to the Third Amendment exceeded its statutory conservator authority. HERA does not require FHFA to prioritize one of its obligations over others. Instead, FHFA may carry out its various duties in the ways it determines are in the best interests of the Companies or itself. "[T]he most natural reading of [HERA] is that it permits FHFA, but does not compel it in any judicially enforceable sense, to preserve and conserve Fannie's and Freddie's assets and to return the Companies to private operation. . . . [HERA] imposes no precise order in which FHFA must exercise its multi-faceted conservatorship powers." *Perry Capital*, 864 F.3d at 607. FHFA does not violate HERA when it prioritizes certain responsibilities—such as managing heavy debt and other financial obligations—over preserving and conserving the Companies' assets in the short term.

Even if HERA required FHFA to put the Companies in a "sound and solvent condition" and to "preserve and conserve" their assets—to the exclusion of other interests—Robinson has not alleged that FHFA exceeded its statutory authority. *See id.* at 609; *Roberts*, 243 F. Supp. 3d at 962–63. Nothing in HERA's text requires FHFA to return the Companies to business as usual while in conservatorship. Indeed, the Companies likely should not return to business as usual. Robinson concedes that in conservatorship the Companies have returned to profitability, even if a large portion of that profit was sent to "Treasury's coffers." And Treasury's continuing funding commitment guarantees that the Companies will remain solvent. *See Roberts*, 243 F. Supp. 3d at 963. FHFA's agreeing to the Third Amendment is therefore well within its conservator powers under HERA and does not intrude on FHFA's separate and inapplicable authority as the Companies' receiver.[9]

---

[9]Judge Brown in her *Perry Capital* dissent determined that FHFA may not exercise its powers as both a conservator and receiver simultaneously. *See id.* at 642–43 (Brown, J., dissenting). She further found that FHFA had violated HERA because, under the guise of a conservator, FHFA "had functionally removed itself from the role of a HERA conservator," *id.* at 645, and its agreement to the Third Amendment "placed the Companies in *de facto* liquidation," *id.* at 646. We agree with Judge Brown that FHFA exceeds its statutory conservator authority if it attempts to exercise its conservator and exclusive receiver powers simultaneously. *See id.* at 642–43. However, we must agree with the *Perry Capital* majority that in agreeing to the Third Amendment, FHFA did not encroach on any of the exclusive powers granted to FHFA when it acts as a receiver.

**3.**

In her fourth argument, Robinson asserts that FHFA improperly ceded its independence to Treasury by agreeing to the Third Amendment. Robinson argues that FHFA violated HERA—specifically § 4617(a)(7), which states that FHFA "shall not be subject to the direction or supervision of any other agency"—because it agreed to the Third Amendment under pressure from Treasury. The district court rejected this argument, determining that Robinson did not fall within the "zone of interests" protected by that provision and that she lacked prudential standing to pursue the claim.

Robinson has failed to allege that she is within the zone of interests protected by the relevant provision of HERA. The zone-of-interests test asks "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970). "Whether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question . . . , but by reference to the particular provision of law upon which the plaintiff relies." *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997) (citation omitted). HERA gives FHFA authority over "critically undercapitalized regulated entities," 12 U.S.C. § 4617, including specifically, Fannie Mae and Freddie Mac, *see* 12 U.S.C. § 4502 (20)(A) and (B). Section 4617(a) governs the appointment of FHFA as conservator or receiver of such entities, and subsection 4617(a)(7) in particular establishes FHFA's independence "[w]hen acting as conservator or receiver." Robinson relies on subsection 4617(a)(7) to assert that FHFA exceeded its statutory authority by yielding to Treasury's demands and agreeing to the Third Amendment. But § 4617(a) mentions shareholders only twice, both times in the context of FHFA's appointment as conservator or receiver, and subsection 4617(a)(7) mentions shareholders not at all. Rather, that subsection addresses only FHFA and explicitly protects FHFA's independence when acting as conservator or receiver. It does not concern shareholders, much less protect Robinson's interest as a shareholder in the Companies. *See Saxton*, 245 F. Supp. 3d at 1077 ("In other words, § 4617(a)(7) specifically functions to remove obstacles to FHFA's exercise of conservator powers—*i.e.* to preserve

FHFA's interests, not those of [the Companies'] shareholders.  Appropriately viewed through this lens, the court concludes that Plaintiffs are not within the zone of interests created by § 4617(a)(7)."); *cf. Fed. Hous. Fin. Agency v. City of Chicago*, 962 F. Supp. 2d 1044, 1059 (N.D. Ill. 2013) (explaining that HERA preempts municipalities from regulating FHFA via passage of local laws and ordinances).  Robinson has thus failed to allege that she falls within the zone of interests protected by § 4617(a)(7), and the district court properly determined that she lacked prudential standing to bring her claim regarding FHFA's independence.[10]

After considering all of Robinson's arguments, we conclude that Robinson has failed to demonstrate that FHFA exceeded its statutory authority by agreeing to the Third Amendment.  Her claims against FHFA, therefore, are barred by HERA's limitation on court action, § 4617(f).

## C.

Robinson also asserts that HERA's limitation on court action does not apply to her claims against Treasury because Treasury exceeded its statutory authority in two ways.  Robinson argues, first, that Treasury exceeded its statutory authority under HERA by effectuating a "purchase" of new securities after the 2009 statutory deadline.  Robinson asserts that, under the Third Amendment, the Companies effectively "sold Treasury a new obligation—to hand over their net worth each quarter—in exchange for canceling the Companies' fixed-dividend obligations."  This argument is meritless.

The Third Amendment does not effectuate a new "purchase" of the Companies' securities.  Treasury obtained no new shares of the Companies' stock as a result of the Third Amendment, and it did not commit any additional funds to the Companies.  *Cf. Katz v. Gerardi*, 655 F.3d 1212, 1223 (10th Cir. 2011) (explaining exchange of stock units for cash or new stock was not a "purchase" under the 1933 Securities Act because plaintiff "owned the same A–1 Units both before and after the merger was announced.  Nothing can convert the sale . . . into a purchase of shares he never acquired"); *Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 534 (7th Cir. 1998) (explaining that the exchange of one stock for another during spinoff of a

---

[10]FHFA also argues that, even if Robinson fell within the relevant zone of interests, she failed to plausibly allege that Treasury compelled FHFA to agree to the Third Amendment.  The district court did not address this issue and, having determined that Robinson lacks prudential standing to bring such a claim, we need not address it either.

manufacturer's wholly owned subsidiary did not constitute a sale or purchase of securities because plaintiffs did not "buy or sell any securities"). Instead, the Third Amendment merely altered the compensation structure for the stock that Treasury already owned and for which Treasury was already receiving dividends. *See Roberts*, 243 F. Supp. 3d at 963 ("[T]he Third Amendment was an exercise of rights received in connection with securities it had purchased before its purchase authority expired, not a *new* purchase." (internal citations omitted)); *Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208, 224 (D.D.C. 2014) ("Without providing an additional funding commitment or receiving new securities from the [Companies] as consideration for its Third Amendment to the already existing PSPAs, Treasury cannot be said to have purchased new securities . . . ." (internal citation omitted)), *aff'd in part, rev'd on other grounds*, *Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017). The Third Amendment altered Treasury's compensation structure, but that restructuring does not constitute a "purchase" of new securities from the Companies.

Second, Robinson asserts that Treasury exceeded its statutory authority by agreeing to the Third Amendment because HERA does not authorize Treasury to amend the PSPAs. Even though HERA authorizes Treasury to "exercise any rights received in connection with . . . any obligations or securities purchased" from the Companies, 12 U.S.C. §§ 1455(*l*)(2)(D), 1719(g)(2)(D), Robinson argues that those rights do not include the right to amend. Specifically, Robinson argues that a "right" is an "entitlement to do something" and, because the Companies must consent to amendment, Treasury does not have an entitlement to any amendment.

The plain language of the PSPAs disproves Robinson's assertion. The original PSPAs explicitly conferred on the Companies and Treasury the right to "waive[] or amend[] [the PSPAs] solely by writing executed by both of the parties . . . ." Presuming that Robinson's definition of the term "right" is accurate, the PSPAs expressly grant Treasury an entitlement to amend, albeit with the condition that such entitlement be exercised in coordination with the Companies. Treasury and the Companies exercised that right when they agreed to the each of the three amendments to the PSPAs, and Robinson does not allege that the First Amendment or Second Amendment exceeded Treasury's authority under HERA. Robinson cites no case, and we have found none, that supports her contention that Treasury did not exercise its right to

amend the PSPAs simply because it "could not unilaterally require" the Companies to agree to the amendment. Because the PSPAs gave Treasury the express right to amend, Treasury's agreement to the Third Amendment did not exceed its statutory authority under HERA.

Robinson has failed to demonstrate that Treasury exceeded its statutory authority by purchasing new securities from the Companies or by agreeing to the Third Amendment. Her claims against Treasury, therefore, are barred by HERA's limitation-on-court-action provision, § 4617(f).

## IV.

The district court correctly determined that Robinson's APA claims against FHFA and Treasury are barred by HERA's limitation-on-court-action provision. Robinson's protean attempts to unravel the Third Amendment all "restrain or affect" FHFA's "exercise of powers or functions" as the Companies' conservator," 12 U.S.C. § 4617(f), and she has failed to demonstrate that FHFA or Treasury exceeded the statutory authority granted to them by HERA. In the wake of the 2007–2008 economic recession, Congress granted to the Companies "unprecedented access" to guaranteed capital from Treasury. And, in exchange, Congress also granted FHFA unparalleled authority to manage the Companies' business. As unfair and ill-advised as Robinson understandably finds that allocation to be, "even the most formidable argument concerning the statute's purposes [cannot] overcome the clarity [of] the statute's text." *Kloeckner v. Solis*, 568 U.S. 41, 55, n.4 (2012). The Constitution granted to Congress "[a]ll legislative Powers" enumerated in the Constitution, U.S. Const. art. 1, § 1, making Congress, and not appellate courts, "responsible for both making laws and mending them." *King v. Burwell*, 135 S. Ct. 2480, 2505 (2015) (Scalia, J., dissenting). Absent constitutional defect, which Robinson has not alleged here, Congress is the proper governmental body to address poor legislative decisions. Appellate courts hold only "judicial power—the power to pronounce the law as Congress has enacted it." *Id.* We must therefore AFFIRM the district court's judgment.