In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-1880

CHRISTOPHER ROBERTS, *et al.*,

*Plaintiffs-Appellants*,

*v.*

FEDERAL HOUSING FINANCE AGENCY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 2107 — **Edmond E. Chang**, *Judge*.

ARGUED OCTOBER 30, 2017 — DECIDED MAY 3, 2018

Before WOOD, *Chief Judge*, and BAUER and EASTERBROOK,
*Circuit Judges*.

WOOD, *Chief Judge*. At the height of the 2008 financial cri-
sis, Congress created the Federal Housing Finance Agency
(the Agency) and authorized it to place into conservatorship
two critical government-sponsored enterprises—the Federal
National Mortgage Association and the Federal Home Loan
Mortgage Corporation, commonly known as Fannie Mae and

Freddie Mac. 12 U.S.C. § 4617(a). To stabilize Fannie and Freddie, along with the broader financial markets, Congress empowered the U.S. Treasury to purchase their "obligations and other securities" through the end of 2009. 12 U.S.C. §§ 1455(l)(1)(A), 1719(g)(1)(A). The Agency and Treasury acted quickly. In exchange for a cash infusion and fixed funding commitment for each enterprise, Treasury received senior preferred shares. Its shares gave it extraordinary governance and economic rights, including the right to receive dividends tied to the amount of Treasury's payments. But the stabilization effort proved to be more difficult than was initially expected. As Fannie and Freddie's capital needs mounted, Treasury agreed three times to modify the original stock purchase agreements. The First and Second Amendments primarily increased Treasury's funding commitment. The third modification—which, unlike the first two, was made after Treasury's purchasing authority had expired—introduced a variable dividend under which Treasury's dividend rights were set equal to the companies' outstanding net worth.

That net-worth dividend, sometimes called the Net Worth Sweep, is at the heart of this litigation. The plaintiffs are private shareholders of Fannie and Freddie. They sued Treasury and the Agency, claiming that the Agency violated its duties in two ways: by agreeing to the net-worth dividend and by unlawfully succumbing to the direction of Treasury. They fault Treasury both for exceeding its statutory authority and failing to follow proper procedures. The district court dismissed the complaint for failure to state a claim. See 12 U.S.C. § 4617(f). We affirm.

**I**

Fannie Mae and Freddie Mac are mammoth institutions. Although they were chartered by Congress to increase home-loan lending by injecting liquidity into mortgage markets, they have long operated as publicly traded corporations. By 2008, they had come to play an integral role in the United States economy, backing mortgages valued at trillions of dollars and representing a substantial portion of all home loans. As the 2008 financial crisis intensified and the national housing market hovered on the verge of collapse, fears mounted about their vitality. Congress responded by passing the Housing and Economic Recovery Act of 2008 (HERA).

HERA authorizes the director of the Agency to appoint the Agency as conservator or receiver for Fannie or Freddie for a variety of reasons. 12 U.S.C. § 4617(a)(1)–(3). In either of those capacities, the Agency "may" then:

> (i) take over the assets of and operate the regulated entity with all the powers of the shareholders, the directors, and the officers of the regulated entity and conduct all business of the regulated entity;

> (ii) collect all obligations and money due the regulated entity;

> (iii) perform all functions of the regulated entity in the name of the regulated entity which are consistent with the appointment as conservator or receiver;

> (iv) preserve and conserve the assets and property of the regulated entity; and

> (v) provide by contract for assistance in fulfilling any function, activity, action, or duty of the Agency as conservator or receiver.

*Id*. § 4617(b)(B). Additional provisions of HERA apply separately to each of the Agency's two possible roles. The Agency "may, as a conservator, take such action as may be (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." *Id*. § 4617(b)(D). In contrast, "when acting as receiver," the Agency "shall place the regulated entity in liquidation." *Id*. § 4617(b)(E). Finally, the Agency may exercise "such incidental powers as shall be necessary to carry out" powers granted to it in either role, and it may "take any action authorized … which the Agency determines is in the best interests of the regulated entity or the Agency." *Id*. § 4617(b)(J). In exercising any of these powers, the Agency "shall not be subject to the direction or supervision of any other agency of the United States." *Id*. § 4617(a)(7).

At the same time as HERA broadly empowers the Agency, it disempowers courts and existing stockholders, directors, and officers. Unless otherwise permitted by the statute or requested by the Agency's director, "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver." *Id*. § 4617(f). The law also provides that the Agency "shall, as conservator or receiver, and by operation of law, immediately succeed to all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and [its] assets … ." *Id*. § 4617(b)(2)(A); see also *id*. § 4617(b)(2)(K)(i).

Finally, HERA authorized Treasury to purchase securities in Fannie and Freddie "on such terms and conditions … and amounts as the Secretary [of the Treasury] may determine." *Id*. §§ 1455(l)(1)(A), 1719(g)(1)(A). Treasury's purchasing authority continued through December 31, 2009, 12 U.S.C. § 1719(g)(4), after which Treasury could only "hold, exercise any rights received in connection with, or sell, any" of the securities it had purchased, 12 U.S.C. § 1719(g)(2)(D).

After Congress passed HERA, the Agency promptly placed Fannie and Freddie into conservatorship and entered into agreements with Treasury for the sale of senior preferred shares. Treasury initially invested $1 billion in each company and extended $100 billion funding commitments to each. Pursuant to Preferred Stock Purchase Agreements, Treasury received a) an initial liquidation preference in each company of $1 billion, to be increased dollar-for-dollar as each company drew on its $100 billion funding commitment, b) a quarterly cumulative dividend, c) an annual commitment fee waivable at Treasury's discretion, and d) warrants to purchase approximately 80 percent of each company's common stock. The companies could elect to pay the dividend in cash at an annualized rate equal to ten percent of Treasury's outstanding liquidation preference or by increasing that preference by twelve percent. The Purchase Agreements required Treasury's consent before terminating the companies' conservatorships, engaging in fundamental transactions, or taking on significant debt.

Freddie and Fannie continued to burn through cash, prompting the parties to execute a First Amendment to the Purchase Agreements. That amendment increased Treasury's

funding commitment to $200 billion per company. On December 24, 2009, days before Treasury's purchase authority expired, a set of Second Amendments allowed the companies to draw funds from Treasury in excess of that $200 billion to cover losses incurred through the end of 2012. Thereafter, the funding commitments would again become fixed based upon the sums actually drawn. Fannie and Freddie eventually drew more than $187 billion from Treasury. Treasury and the Agency agreed to a Third Amendment to each Purchase Agreement in August 2012. This replaced Treasury's fixed dividend with a variable dividend equal to an amount slightly less than each company's net worth. In other words, it funneled substantially all profits (if any) to the federal government. The Third Amendment also eliminated Treasury's right to an annual commitment fee.

The plaintiffs complain that the Third Amendment was adopted just as Freddie and Fannie were returning to profitability in order to capture all anticipated upside for Treasury to the detriment of the corporations and their private shareholders. The Agency and Treasury counter that the net-worth dividend served to prevent the companies from running up against the soon-to-be fixed funding commitment. They note that Freddie and Fannie had consistently borrowed from Treasury to pay the fixed-rate dividends—a practice that resulted in a spiral of ever greater liquidation preferences and dividends.

The plaintiffs sued Treasury and the Agency under the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706(2)(A), (C), and (D). They argue first that the Agency exceeded its statutory authority as a conservator by agreeing to both the original Purchase Agreements and the Third Amendment.

Second, they asserted that the Third Amendment amounted to a purchase of new securities by Treasury after its purchasing authority had expired and without having made findings required by HERA. Finally, they claim that Treasury acted arbitrarily and capriciously in agreeing to the Third Amendment. They sought declaratory and injunctive relief, including the rescission of the Third Amendment and return of all resulting dividend payments made to Treasury.

The district court granted both defendants' motion to dismiss the complaint, finding that 12 U.S.C. § 4617(f) precluded the relief requested. We examine that ruling *de novo*, looking first at the Agency and then at Treasury.

## II

With regard to the Agency, our review is squarely foreclosed by 12 U.S.C. § 4617(f). That provision bars judicial interference with the Agency's statutorily authorized role as conservator. Because the Agency acted within its powers as conservator in agreeing to the Preferred Stock Purchase Agreements and the Third Amendment, declaratory and injunctive relief cannot run against it.

Section 4617(f) bars "any" judicial interference with the "exercise of *powers or functions* of the Agency *as a conservator or a receiver*." 12 U.S.C. § 4617(f) (emphases added). This shelter is sweeping, but its scope is not boundless. Section 4617(f) will not protect the Agency if it acts either *ultra vires* or in some third capacity. See *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 606 (D.C. Cir. 2017); *id*. at 636 (Brown, J., dissenting in part); *Robinson v. Fed. Hous. Fin. Agency*, 876 F.3d 220, 227–28 (6th Cir. 2017); see also, *e.g.*, *Cnty. of Sonoma v. Fed. Hous. Fin. Agency*, 710 F.3d 987, 992 (9th Cir. 2013); *Leon Cnty.,*

*Fla. v. Fed. Hous. Fin. Agency*, 700 F.3d 1273, 1278 (11th Cir. 2012). That is, for section 4617(f) to bar judicial relief, the Agency must have acted a) pursuant to its "powers or functions" and b) "as a conservator or a receiver."

In so construing section 4617(f), we have taken guidance from our interpretation of 12 U.S.C. § 1821(j), a materially identical provision in the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA). That statute limits recourse against the Federal Deposit Insurance Corporation (FDIC) and, formerly, the Resolution Trust Corporation. We have also considered FIRREA's predecessor, which appeared in the Financial Institutions Supervisory Act of 1966, formerly codified at 12 U.S.C. § 1464(d)(6)(C). "[W]hen Congress uses the same language in two statutes having similar purposes," as do these acts, "it is appropriate to presume that Congress intended that text to have the same meaning" in each statute. *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005). Thus, interpretations of that language in one statute may provide "precedent of compelling importance" when construing the other. *Id.*; see also *Perry Capital LLC*, 864 F.3d at 605–06 (interpreting section 4617(f) in light of section 1821(j)); *Robinson*, 876 F.3d at 227 (same).

Although section 1821(j) works a "sweeping ouster of courts' power to grant equitable remedies," *Veluchamy v. F.D.I.C.*, 706 F.3d 810, 817 (7th Cir. 2013) (quoting *Courtney v. Halleran,* 485 F.3d 942, 948 (7th Cir. 2007)), we have understood that ouster to apply only insofar as the FDIC exercises powers granted to it as a conservator or a receiver, see *id.* at 818. Circuits that have had to confront the issue head-on have agreed. *E.g.*, *Gross v. Bell Sav. Holdings, Inc. Money Purchase Plan*, 974 F.2d 403, 408 (3d Cir. 1992); see also *Coit Indep. Joint*

*Venture v. Fed. Sav. & Loan Ins. Co.*, 489 U.S. 561, 574 (1989) (applying Financial Institutions Supervisory Act). Section 1821(j) thus reaffirms our view that 12 U.S.C. § 4617(f) bars declaratory or injunctive relief against the Agency unless it acted *ultra vires* or in a role other than as conservator or receiver.

In the present case, the Agency neither exceeded its powers nor acted as other than a conservator in agreeing to the Third Amendment. The plaintiffs' argument to the contrary rests primarily on their assertion that the Third Amendment dissipated corporate assets in violation of the Agency's purportedly mandatory duties as a conservator to "preserve and conserve the assets and property" of Freddie and Fannie and to place the companies in a "sound and solvent condition." 12 U.S.C. § 4617(b)(2)(D); see also 12 U.S.C. § 4617(b)(2)(B)(iv). The problem with this contention is two-fold: first, HERA does not impose such mandatory duties on conservators; and second, the factual assertions in the plaintiffs' complaint could not establish that agreeing to the Third Amendment necessarily contravened those duties.

In fact, section 4617(b)(2)(D) does not *require* the Agency to do anything. It uses the permissive "may," rather than the mandatory "shall" or "must," to introduce the Agency's power as conservator to "preserve and conserve" Freddie's and Fannie's assets and to restore their solvency. 12 U.S.C. § 4617(b)(2)(D); see also *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."). Congress's choice of "may" in this part of HERA does not strike us as accidental. The statute consistently distinguishes between "shall" and "may" with the latter

term reserved for situations in which one would expect the exercise of discretion. For example, the Agency "*may*, at the discretion of the Director, be appointed conservator *or* receiver" if Fannie's or Freddie's obligations exceed its assets for a brief period of time, 12 U.S.C. § 4617(a)(2) (emphasis added); see also *id*. § 4617(a)(3)(A), but the Director "*shall* appoint the [Agency] as receiver" if Fannie or Freddie's obligations exceed their assets for 60 days, *id*. § 4617(a)(4)(A)(i) (emphasis added). Likewise, the Agency "may, as conservator or receiver, transfer or sell any asset or liability" of the companies, *id*. § 4617(b)(2)(G), but it "shall" utilize the proceeds from any such sale to pay their debts, *id*. § 4617(b)(2)(H). That distinction between the Agency's powers and duties makes sense: A conservatorship that *required* liquidation would be, in effect, a receivership. See *id*. § 4617(b)(2)(E).

We have also considered the context of section 4617(b)(2)(D) in concluding that the provision grants discretion to the Agency. In interpreting HERA, as with any statute, we avoid a reading that would render its provisions inconsistent or redundant. *United States v. Miscellaneous Firearms, Explosives, Destructive Devices & Ammunition*, 376 F.3d 709, 712 (7th Cir. 2004). Section 4617(b)(2)(D) is part of a broader listing of the Agency's powers. Thus, section 4617(b)(2)(B) concerns the Agency's authority as either receiver or conservator, 12 U.S.C. § 4617(b)(2)(B), while section 4617(b)(2)(E) addresses its powers as a receiver, *id*. § 4617(b)(2)(E), and section 4617(b)(2)(D) concerns its powers as a conservator, *id*. § 4617(b)(2)(D). Section 4617(b)(2)(B) already allows a conservator or receiver to "preserve and conserve the assets and property" of the companies. *Id*. § 4617(b)(2)(B)(iv). This grant of authority in section 4617(b)(2)(B) must be treated as discretionary to avoid creating a conflict with section 4617(b)(2)(E),

which empowers the Agency as receiver to liquidate the companies "through the sale of assets." *Id*. § 4617(b)(2)(E). Therefore, section 4617(b)(2)(D) cannot *require* the Agency to "preserve and conserve" the companies' assets as a conservator, or else it would conflict with the discretionary grant of the same authority in section 4617(b)(2)(B) or render it superfluous.

Instead, section 4617(b)(2)(D) grants *additional* authority to the Agency. Apart from the powers granted to it elsewhere in HERA, the Agency has the authority as conservator to undertake any additional action or means "as may be (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve" its assets. *Id.* § 4617(b)(2)(D). The preservation and conservation of assets does impose a limitation of sorts—but only when the Agency has to rely on section 4617(b)(2)(D) because it can find no other source of power in HERA. In the present case, however, the Agency can point to several independent sources of authority to enter into the Third Amendment, including its power to "operate" Fannie and Freddie "with all the powers" of their shareholders, directors, and officers. *Id*. § 4617(b)(2)(B)(i).

Thus, by agreeing to the Third Amendment, the Agency did not violate its duty to conserve Fannie and Freddie's assets, because it had no rigid duty to do so. The plaintiffs' fundamental error is to mistake the point of an Agency conservatorship: its "purpose [is the] reorganizing, rehabilitation, or winding up" of the companies' affairs, *id*. § 4617(a)(2), not just the preservation of assets.

Even accepting for the sake of argument the plaintiffs' construction of section 4617(b)(2)(D) as imposing a mandatory duty, their complaint does not establish that the Third Amendment contravened this obligation. The question under section 4617(f) is not whether the Agency made a poor business judgment, but rather whether it took an action fundamentally inconsistent with its powers as a conservator. *Perry Capital LLC*, 864 F.3d at 607 ("The [appellants] no doubt disagree about the necessity and fiscal wisdom of the Third Amendment. But Congress could not have been clearer about leaving those hard operational calls to the Agency's managerial judgment.").

While the dividend terms under the Third Amendment may initially have proven more profitable to Treasury than to Fannie and Freddie, a conservator could have believed that the amendment's terms would further the conservation of the companies' assets better than either the ten-percent cash dividend or the twelve-percent increases in liquidation preference. The plaintiffs admit that the earlier cash dividend had necessitated drawing on Treasury's funding commitment, leading to increased liquidation preferences and, in turn, future dividends owed to Treasury. The prior arrangement also reduced the Treasury funds available for future draws. The plaintiffs themselves said in their complaint that paying cash dividends "contravene[d the Agency's] obligations as conservator," a view reiterated in their brief. The Third Amendment permanently eliminated the risk that cash-dividend payments would consume the companies' financial lifeline, and it forever prevented Treasury from demanding payment of commitment fees.

The alternative of adding to the liquidation preference, though preferred by the plaintiffs, came with its own problems. While this option would have obviated the need to draw down Treasury's funding commitment, it would have increased Treasury's liquidation preference at a faster rate. (Recall that the liquidation preference increases dollar-for-dollar with draws on Treasury's funding commitment. Therefore, a fully financed cash dividend would have increased the liquidation preference by ten—rather than twelve—percent.)

While the plaintiffs seem to treat growth of the liquidation preference as a harmless accounting quirk, that preference places real constraints on the companies' future. First, a liquidation preference is, most immediately, a claim on the assets of the corporation. Pursuing a policy that would eventually shift assets to Treasury would seem to go to the heart of the plaintiffs' complaint that the Agency adopted policies that dissipated corporate assets. Second, the companies can potentially redeem Treasury's preferred shares by paying down the liquidation preference. Redemption thus becomes more expensive and difficult as the liquidation preference increases. Yet, redeeming Treasury's shares would create real benefits for the companies: for example, the outstanding shares create dividend obligations, they limit the companies' ability to raise capital and debt, and, as the plaintiffs complain, the covenants in the Purchase Agreements limit the companies' independence. An ever-increasing liquidation preference also makes it more costly for the companies to pay cash dividends in the future, creating a vicious cycle of paying liquidation-preference dividends. Against this backdrop, adopting the net-worth dividend in the Third Amendment was not necessarily an unjustifiable dissipation of corporate assets.

Finally, the plaintiffs fail to appreciate that the Agency's conservatorship of the companies has no fixed expiration date. Even if the Amendment has benefited Treasury thus far—and the Agency could anticipate its having done so—that does not establish that the Amendment will ultimately place the companies in a worse financial position than they would have been in under prior versions of the agreement. The Agency could not know for how long the companies might remain profitable or to what extent. While Treasury realized additional dividend earnings in 2013 and 2014 (as compared to the situation before the Third Amendment), it actually fared worse under the net-worth dividend in 2015 than it would have under the old cash dividend. (Though not part of the record on which we resolve this appeal, we note that fluctuations continue. Under the new tax law, the net-worth formula has produced a loss in the fourth quarter 2017 of $6.7 billion at Fannie and will likely require the company to draw $3.7 billion from Treasury to eliminate its resulting net-worth deficit. Federal National Mortgage Association, Annual Report for 2017 (Form 10-K) (Feb. 14, 2018) at 2–3. Freddie, meanwhile, will draw $312 million from Treasury to cure its negative net worth. Federal Home Loan Mortgage Corporation, Annual Report 2017 (Form 10-K) (Feb. 15, 2018) at 2, 117.) In short, the plaintiffs have failed—both as a matter of statutory interpretation and as a matter of facts alleged—to state a claim that the Agency acted outside its authority as a conservator and thereby lost the protection of section 4617(f).

We also reject the plaintiffs' alternate argument that the Agency acted contrary to its statutory authority by deferring to Treasury in violation of 12 U.S.C. § 4617(a)(7). Section 4617(a)(7) bars the Agency from being "subject to the direction or supervision of any other agency" when exercising its

"rights, powers, and privileges" as conservator. 12 U.S.C. § 4617(a)(7). The plaintiffs alleged that the Agency breached this prohibition by ceding significant control to Treasury in various covenants in the original Purchase Agreements and again by entering into the Third Amendment at Treasury's behest.

This argument fails, however, to read section 4617(a)(7) in harmony with HERA as a whole. See *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). The same HERA that bars another agency from exercising "direction or control" over the Agency authorized Treasury to acquire securities in Fannie and Freddie "on such terms and conditions" as Treasury "may determine." 12 U.S.C. § 1455(l)(1)(A). It also says that Treasury could not force Fannie and Freddie to issue securities "without mutual agreement between" Treasury and the Agency. *Id*. § 1455(l)(1)(A). We read these provisions to mean that, so long as the Agency remained free to reject the terms offered by Treasury and to exercise its independent judgment, nothing prevented the Agency from taking Treasury's advice or agreeing to its terms. Even if, as the complaint alleges, Treasury officials made statements suggesting that Treasury was in the driver's seat and had to convince the Agency to come along for the ride, such behavior alone would not violate section 4617(a)(7).

Two other statutory provisions also preclude the plaintiffs' absolutist reading of section 4617(a)(7), at least insofar as it concerns their attack on the original Purchase Agreements. First, the Agency may "contract for assistance in fulfilling any function, activity, action, or duty of the Agency as conservator or receiver." 12 U.S.C. § 4617(b)(2)(B)(v). Thus, to the extent that the Agency agreed to Purchase Agreements permitting

Treasury to exercise functions related to the Agency's role as conservator by, for example, giving Treasury a role in the termination of conservatorship, transfer of assets, or assumption of debt, the Agency acted within its statutory authority. Second, to the extent that the plaintiffs challenge the original Purchase Agreement, their claim is time-barred by the six-year statute of limitations in the Administrative Procedure Act. 28 U.S.C. § 2401(a). Their attempt to avoid the statute of limitations through the discovery rule is unconvincing. The terms of the original Purchase Agreements were apparent long before the Third Amendment.

### III

Just as section 4617(f) bars the plaintiffs' claims against the Agency, it prevents our granting declaratory and injunctive relief against Treasury. Section 4617(f), once again, prevents us from taking "any action to restrain *or affect* the exercise of powers or functions of [the Agency] as a conservator." 12 U.S.C. § 4617(f) (emphasis added). An injunction or declaratory judgment preventing Treasury—the Agency's counterparty—from honoring the terms of the Third Amendment would fundamentally "affect" the Agency's conservatorships of Fannie and Freddie and so would run afoul of section 4617(f).

Our interpretation of section 4617(f) comports with past applications of section 1821(j), the analogous provision in FIRREA. In the latter context, the Third Circuit has refused to grant injunctions against third parties if the relief would "dramatic[ally] and fundamental[ly]" affect FDIC as a receiver. *Hindes v. Fed. Deposit Ins. Corp.*, 137 F.3d 148, 161 (3d Cir. 1998) ("[S]ection 1821(j) precludes a court order against a third party which would affect the FDIC as receiver, particularly

where the relief would have the same practical result as an order directed against the FDIC in that capacity."); see also *Dittmer Properties, L.P. v. Fed. Deposit Ins. Corp.*, 708 F.3d 1011, 1017 (8th Cir. 2013). Thus, in *Hindes*, it declined to order rescission of a "Notification to Primary Regulator" issued by FDIC in its corporate capacity that precipitated a bank's seizure, and to impose a constructive trust. *Id.* (We note that section 1821(j) directly immunizes FDIC only in its capacity as receiver, not in its corporate capacity.) Those remedies, the Third Circuit thought, would impermissibly "affect the FDIC's continued functioning as receiver and … throw into question every act of FDIC-Receiver." *Id*. Similarly, wiping out Treasury's acceptance of the original Purchase Agreements or the Third Amendment in this case would undermine the very foundations of the Agency's conservatorships of Fannie and Freddie. Appellants effectively ask us to unwind years of action by the Agency predicated on those agreements.

Contrary to the plaintiffs' suggestion, *281–300 Joint Venture v. Onion*, 938 F.3d 35 (5th Cir. 1991), does not stand for the broad proposition that "a third-party federal agency that violates *its own* obligations in connection with a conservatorship or receivership" can be enjoined notwithstanding section 1821(j). Because that case concerned the failure of a savings and loan association, section 1821(j) barred court actions that "restrain[ed] or affect[ed]" the federal Resolution Trust Corporation, rather than FDIC. 12 U.S.C. § 1821(j). The Fifth Circuit did declare the Federal Home Loan Bank Board's determinations "regarding the worthlessness of unsecured creditor claims … subject to review" by the courts, *281–300 Joint Venture*, 938 F.3d at 38. Those judgments, however, were akin to

a decision by the Agency in our case to initiate a conserva-
torship or receivership, and HERA expressly makes such a
decision reviewable. 12 U.S.C. § 4617(a)(5). *281–300 Joint Ven-
ture* says nothing about enjoining third parties dealing with
the Agency after its conservatorship begins. At that point, the
Agency acts as an immune conservator rather than as a non-
immune regulator.

In any case, Treasury did not exceed its statutory authority
in agreeing to the Third Amendment. HERA permitted Treas-
ury to purchase Fannie's and Freddie's securities "on such
terms and conditions as the Secretary may determine"
through December 31, 2009. 12 U.S.C. §§ 1719(g)(1)(A), (g)(4).
After that date, Treasury could continue to "hold, exercise
any rights received in connection with, or sell, any" of the se-
curities it had purchased. *Id*. § 1719(g)(2)(D). Treasury negoti-
ated modification rights as part of the terms of the original
Purchase Agreements, and it exercised those rights when it
agreed to the Third Amendment.

The plaintiffs' unconvincing attempt to equate the Third
Amendment to the issuance of new securities relies heavily
on inapt analogies to securities law and IRS regulations and
rhetorical flourishes about expropriation. As for expropria-
tion, all we need say is that this is the wrong place in which
to explore that subject. We were told at oral argument that the
plaintiffs are pursuing a takings claim in the Court of Federal
Claims, which is the proper forum for such a case. As for their
arguments relying on analogies to securities law, the short an-
swer is that those laws use their own definition of the term
"security," see 15 U.S.C. § 78c(a)(10). That definition includes
"any put, call, straddle, option, or privilege on any security."

*Id.* Judges have no authority to add or subtract from that language. See *Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985) (rejecting a rule under which a sale of business accomplished by selling 100% of a company's stock was somehow not covered by the securities laws). Any economic equivalence between the Third Amendment and the issuance of new securities does not manufacture new stock out of thin air.

Nothing in the Internal Revenue Code helps plaintiffs either. Their own brief asserts that the IRS treats "a significant modification of a debt instrument" as an exchange of debt instruments, 26 C.F.R. § 1.1001-3(b), in order "[*t*]*o prevent tax evasion*." The desire to forestall fraud and abuse lies behind the interpretation of the terms "sale" and "exchange" in the tax and securities contexts; HERA has different goals and thus must be read on its own.

The plaintiffs also argue that Treasury could not have exercised a "right" in entering into the Third Amendment because it could not amend the Purchase Agreements unilaterally. We cannot accept such a cramped construction of the term "right." One need not invoke First Amendment associational rights or the *Lochner* Era's "right to contract" to spot the weakness of this definition. Rights are often contingent. In the corporate context, shareholders frequently cannot exercise voting rights unless the board calls a meeting to consider the matter at hand. Likewise, a poison pill may give stockholders a right to purchase additional shares, but their ability to exercise that right (at least at an economically rational price) depends entirely on the purchases of a would-be acquirer and the unwillingness of the board to redeem the pill. Under the Purchase Agreements and the Third Amendment, Treasury

receives a payout of its liquidation preference if the companies opt to pay it or to dissolve. The shareholders do not challenge Treasury's right to collect these benefits on the ground that Treasury cannot unilaterally trigger their payment. Nor do the shareholders contest Treasury's right to receive dividends only if the companies' boards declare them. Along the same lines, the Purchase Agreements permit the amendments as long as the parties comply with certain restrictions. In other words, Treasury's shares came with a right to amend the Purchase Agreements, even if that right required the participation and consent of those who governed the companies.

## IV

Our discussion thus far is enough to demonstrate why the district court correctly dismissed this suit. For the sake of completeness, we add that section 4617(b)(2)(A)(i) of HERA independently supports that outcome. That provision names the Agency the successor to "all rights, titles, powers, and privileges of [Fannie and Freddie], and of any stockholder, officer, or director … with respect to" the companies and their assets. 12 U.S.C. § 4617(b)(2)(A)(i). Applying the analogous provision of FIRREA, 12 U.S.C. § 1821(d)(2)(A)(i), we have held that the FDIC thereby acquires the sole right to bring derivative actions on behalf of failed institutions, *Levin v. Miller*, 763 F.3d 667, 669 (7th Cir. 2014); see also *Courtney v. Halleran*, 485 F.3d 942, 950 (7th Cir. 2007). We must therefore consider whether the shareholders have brought derivative claims. If so, then they must yield to the Agency.

The law governing the companies' internal affairs controls whether a claim is direct or derivative for purposes of HERA, just as it would for FIRREA. *Id.* at 670. Fannie and Freddie are both federally chartered corporations, but each has selected a

state law for its internal affairs: Fannie has chosen Delaware corporate law, 12 C.F.R. § 1239.3(b); FANNIE MAE BYLAWS (July 21, 2016), § 1.05; and Freddie has elected the law of Virginia, 12 C.F.R. § 1239.3(b); BYLAWS OF THE FEDERAL HOME LOAN MORTGAGE CORPORATION (July 7, 2016), § 11.3. In Delaware, whether a suit is direct or derivative "must turn *solely* on … : (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). While Virginia has not expressly decided whether to adopt the *Tooley* test, *Remora Invs., L.L.C. v. Orr*, 673 S.E.2d 845, 848 (Va. 2009), its reasoning in past cases indicates a consistent approach. See, *e.g.*, *Simmons v. Miller*, 544 S.E.2d 666, 674–75 (Va. 2001); *Little v. Cooke*, 652 S.E.2d 129, 136 (Va. 2007).

The present complaint states a derivative claim. The harm the plaintiffs allege, for purposes of *Tooley*, is that the net-worth dividend illegally dissipated corporate assets by transferring them to Treasury. They complain, in effect, of a combination of mismanagement and depletion of corporate assets through overpayment, both of which are classic derivative claims. See *In re Massey Energy Co. Derivative & Class Action Litig.*, 160 A.3d 484, 503 (Del. Ch. 2017) (mismanagement); *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016) (overpayment).[1] Turning to the benefit inquiry, the

---

[1] Admittedly, a conflict between shareholders (or classes of shareholders) can sometimes qualify as a direct action as well as derivative. These situations, however, generally include allegations of an unlawful transfer of *control*, see *In re Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1052 (Del. Ch. 2015); *El Paso Pipeline*, 152 A.3d at 1263–64 (discussing *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006)), or fraudulent efforts to induce the

complaint seeks only benefits that would inure to the benefit of the corporations, rather than individual stockholders. The plaintiffs have demanded, for example, the effective rescission of (at least elements of) a contract between the *companies* and Treasury, the return of dividend payments to the corporate treasuries, and the end of Treasury control over the companies through the Purchase Agreements' covenants.

Finally, we do not see a conflict-of-interest exception implicit in section 4617(b)(2)(A)(i). Its language is clear and absolute, and HERA itself approves of the Agency's taking actions in its own interests as well as that of the companies. 12 U.S.C. § 4617(b)(2)(J)(ii). Only two circuits have apparently recognized a conflict-of-interest exception in the FIRREA context, and those cases are easily distinguished. *First Hartford Corporate Pension Plan & Trust v. United States* concerned FDIC's breach of a distinct contract entered into *before* the bank entered FDIC receivership. 194 F.3d 1279, 1283–84 (Fed. Cir. 1999). The Federal Circuit expressly limited its conflict-of-interest exception to situations "in which a government contractor with a putative claim of breach by a federal agency is being operated by that very same federal agency." *Id*. at 1295. *First Hartford* thus stands for the proposition that the accident of receivership should not serve to extinguish an asset (whether seen as a contractual right or chose in action) of the

---

sale or purchase of securities for personal gain, see *In re Massey Energy*, 160 A.3d at 504 (Del. Ch. 2017) (emphasis in original). Neither is the case here. Treasury acquired no voting rights, and the complaint does not allege that any shareholders transferred their shares. Even in the case of a controlling shareholder (which Treasury was not), the "extraction of solely economic value from the minority" is not a direct injury if "not coupled with any voting rights dilution." *El Paso Pipeline*, 152 A.3d at 1264.

bank. Likewise, in the Ninth Circuit case of *Delta Savings Bank v. United States*, the plaintiffs wished to sue the Office of Thrift Supervision for racial discrimination in placing the bank *into* receivership—not for operating the bank once in receivership. 265 F.3d 1017, 1020 (9th Cir. 2001). HERA already authorizes derivative challenges to the decision to place the companies into conservatorship or receivership. 12 U.S.C. § 4617(a)(5)(A). What section 4617(b)(2)(A)(i) does not authorize are shareholder suits that would interfere with the Agency's decisions as conservator once that conservatorship is underway. Otherwise, shareholders could challenge nearly any business judgment of the Agency using a derivative suit, by invoking a conflict-of-interest exception.

### V

We therefore AFFIRM the decision of the district court to dismiss this lawsuit. HERA prevents this court from granting the relief requested against both the Agency and Treasury, and it precludes the shareholders from requesting that relief on behalf of the companies.