# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-1727

_____

Thomas Saxton; Ida Saxton; Bradley Paynter

*Plaintiffs - Appellants*

v.

Federal Housing Finance Agency, in its capacity as Conservator of the Federal
National Mortgage Association and the Federal Home Loan Mortgage
Corporation; Melvin L. Watt, in his official capacity as Director of the Federal
Housing Finance Agency; United States Department of the Treasury

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: May 15, 2018
Filed: August 23, 2018

_____

Before BENTON, KELLY, and STRAS, Circuit Judges.

_____

KELLY, Circuit Judge.

Three shareholders claim that the federal agency Congress created to serve as conservator of Fannie Mae[1] and Freddie Mac[2] exceeded its powers and acted arbitrarily and capriciously. Four of our sister circuits—the Fifth,[3] Sixth, Seventh, and D.C. Circuits—have already rejected materially identical arguments from other shareholders. Today, we join them.

I.

The financial crisis of 2008 prompted Congress to take several actions to fend off economic disaster. One of those measures propped up Fannie Mae and Freddie Mac. Fannie and Freddie, which were founded by Congress back in 1938 and 1970, buy home mortgages from lenders, thereby freeing lenders to make more loans. See generally 12 U.S.C. § 4501. Although established by Congress, Fannie and Freddie operate like private companies: they have shareholders, boards of directors, and executives appointed by those boards. But Fannie and Freddie also have something most private businesses do not: the backing of the United States Treasury.

In 2008, with the mortgage meltdown at full tilt, Congress enacted the Housing and Economic Recovery Act (HERA or the Act). HERA created the Federal Housing Finance Agency (FHFA), and gave it the power to appoint itself either conservator or receiver of Fannie or Freddie should either company become critically undercapitalized. 12 U.S.C. § 4617(a)(2), (4). The Act includes a provision limiting judicial review: "Except as provided in this section or at the request of the Director,

---

[1]Officially, the Federal National Mortgage Association.

[2]Officially, the Federal Home Loan Mortgage Corporation.

[3]The Fifth Circuit also addressed constitutional questions concerning the conservator agency. See Collins v. Mnuchin, ___ F.3d ___, 2018 WL 3430826, at *6–26 (5th Cir. July 16, 2018) (per curiam). No constitutional questions are presented here.

no court may take any action to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator or a receiver." Id. § 4617(f).

Shortly after the Act's passage, FHFA determined that both Fannie and Freddie were critically undercapitalized and appointed itself conservator. FHFA then entered an agreement with the U.S. Department of the Treasury whereby Treasury would acquire specially-created preferred stock and, in exchange, would make hundreds of billions of dollars in capital available to Fannie and Freddie. The idea was that Fannie and Freddie would exit conservatorship when they reimbursed the Treasury.

But Fannie and Freddie remain under FHFA's conservatorship today. Since the conservatorship began, FHFA and Treasury have amended their agreement several times. In the most recent amendment, FHFA agreed that, each quarter, Fannie and Freddie would pay to Treasury their entire net worth, minus a small buffer. This so-called "net worth sweep" is the basis of this litigation.

Three owners of Fannie and Freddie common stock sued FHFA and Treasury, claiming they had exceeded their powers under HERA and acted arbitrarily and capriciously by agreeing to the net worth sweep. The shareholders sought only an injunction setting aside the net worth sweep; they dismissed a claim seeking money damages. Relying on the D.C. Circuit's opinion in Perry Capital LLC v. Mnuchin, 864 F.3d 591 (D.C. Cir. 2017), the district court[4] dismissed the suit.

II.

The shareholders argue their claims should have survived dismissal because FHFA and Treasury exceeded their statutory authority under HERA by agreeing to

---

[4]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa.

the net worth sweep. We review the dismissal of the shareholders' case de novo. Dunbar v. Wells Fargo Bank, 709 F.3d 1254, 1256 (8th Cir. 2013); ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters, 645 F.3d 954, 958 (8th Cir. 2011).

A.

We begin with the shareholders' request for an injunction against FHFA. Their argument has two parts. First, they assert that HERA's limitation on judicial review does not apply when FHFA exceeds its statutory powers under the Act. Second, they contend that the net worth sweep exceeds, and is antithetical to, FHFA's statutory powers.

1.

HERA commands that, "[e]xcept as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator or a receiver." 12 U.S.C. § 4617(f). We agree with our sister circuits that this provision bars only equitable relief, and only does so if the challenged action is within the powers given FHFA by HERA. See Collins, 2018 WL 3430826, at *6; Roberts v. Fed. Hous. Fin. Agency, 889 F.3d 397, 402 (7th Cir. 2018); Robinson v. Fed. Hous. Fin. Agency, 876 F.3d 220, 228 (6th Cir. 2017); Perry Capital, 864 F.3d at 606; see also Cty. of Sonoma v. Fed. Hous. Fin. Agency, 710 F.3d 987, 992–93 (9th Cir. 2013).

The shareholders argue that we must construe § 4617(f), an anti-injunction provision, narrowly. They cite to the "presumption of reviewability," which generally requires "that 'only upon a showing of "clear and convincing evidence" of a contrary legislative intent should the courts restrict access to judicial review.'" Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 671 (1986) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 141 (1967)). When a statute appears to limit a court's

jurisdiction to review agency action, courts usually invoke this presumption and narrowly interpret the statutory provisions at issue. See, e.g., id. at 674–78.[5] But see Briscoe v. Bell, 432 U.S. 404, 410 (1977) (reversing a narrow construction of a jurisdiction-stripping statute because the statutory "language is absolute on its face and would appear to admit of no exceptions"). Here, like our sister circuits, we interpret the anti-injunction provision to apply only to equitable relief, and only where FHFA has acted within its statutory powers. That reading is consistent with the presumption of reviewability.

## 2.

We next consider whether FHFA exceeded its conservatorship powers. To answer this question of statutory interpretation, we examine two portions of § 4617(b)(2). The first is subsection (B), which grants FHFA general powers that apply when it is acting as either a conservator or a receiver. These powers are phrased permissively: "[FHFA] *may*, as conservator or receiver" do such things as "take over the assets and operate [the companies]," "perform all functions of [the companies]," and "preserve and conserve the assets and property of the [companies]." 12 U.S.C. § 4617(b)(2)(B) (emphasis added). Second, we look to subsection (D), which sets out powers specific to FHFA's role as a conservator. These powers are also phrased permissively: "[FHFA] *may*, as conservator, take such actions as *may* be

---

[5]We note that it is not clear whether the anti-injunction provision strips courts of jurisdiction, or merely precludes certain relief. Compare Collins, 2018 WL 3430826, at *6 ("[W]e lack authority to grant relief on any of the Shareholders' statutory claims."), with Roberts, 889 F.3d at 403 ("12 U.S.C. § 4617(f) bars declaratory or injunctive relief against [FHFA] unless it acted ultra vires or in a role other than as conservator or receiver."), and Perry Capital, 864 F.3d at 605 (discussing how an analogous statute "shields from a court's declaratory and other equitable powers a broad swath" of conduct). This issue was not briefed by the parties, and we decline to address it because, in this case, dismissal under either Federal Rule of Civil Procedure 12(b)(1) or Rule 12(b)(6) requires the same analysis.

(i) necessary to put the [companies] in a sound and solvent condition; and (ii) appropriate to carry on the business and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D) (emphasis added).

The shareholders first contend that, although these passages use the permissive "may," they are really mandatory and can be rephrased to say, for instance, that FHFA may *not* take actions that would *not* put the companies in a sound and solvent condition. We disagree. Not every statutory "may" is coupled with an implied "may not." Reading § 4617(b) as a whole, it is clear that Congress intended the permissive "may" to grant FHFA broad discretion in its management and operation of Fannie and Freddie. This reading is supported by the fact that Congress also used mandatory "shall" language in the same section. See, e.g., 12 U.S.C. § 4617(b)(2)(E) ("In any case in which [FHFA] is acting as receiver, [FHFA] *shall* place the regulated entity in liquidation . . . ." (emphasis added)); id. § 4617(b)(2)(H) ("[FHFA], as conservator or receiver, *shall* . . . pay all valid obligations of the regulated entity . . . ." (emphasis added)). As the D.C. Circuit put it, "the most natural reading of [HERA] is that it permits FHFA, but does not compel it in any judicially enforceable sense, to preserve and conserve Fannie's and Freddie's assets and to return the Companies to private operation." Perry Capital, 864 F.3d at 607.

The shareholders next argue that the net worth sweep hurts Fannie and Freddie more than it helps, and so is antithetical to FHFA's role as conservator. This argument invokes traditional notions of conservatorship. But HERA does not subscribe to these notions. HERA authorizes FHFA to act "in the best interests" of either Fannie and Freddie or *itself*. 12 U.S.C. § 4617(b)(2)(J)(ii). This provision "directly undermines [the shareholders'] supposition that Congress intended FHFA to be nothing more than a common-law conservator." Perry Capital, 864 F.3d at 613; see also Robinson, 876 F.3d at 230. In short, HERA does not limit FHFA to the discretion traditionally ascribed to conservators.

-6-

Finally, the shareholders say that we must narrowly construe FHFA's powers to avoid nondelegation problems. But "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them." Clark v. Martinez, 543 U.S. 371, 385 (2005). HERA presents no such choice; its plain language speaks clearly enough.

In sum, the complaint alleges that FHFA is stripping Fannie and Freddie of its capital in an effort to make money for Treasury. But we agree with the district court that FHFA has not exceeded its powers in assenting to the net worth sweep.[6] As a result, HERA's anti-injunction provision applies, ending the case against FHFA.

B.

The shareholders also seek an injunction barring Treasury from participating in the net worth sweep. Again our starting point is whether the anti-injunction provision applies. The shareholders say that it does not because the injunction they seek would restrain Treasury, not FHFA. That argument ignores the plain language of the anti-injunction provision, which bars injunctions that "*restrain* or *affect* the exercise of powers or functions of [FHFA] as a conservator or a receiver." 12 U.S.C.

---

[6]The shareholders also assert that FHFA impermissibly agreed to the net worth sweep at Treasury's direction. See 12 U.S.C. § 4617(a)(7) ("When acting as conservator or receiver, [FHFA] shall not be subject to the direction or supervision of any other agency of the United States or any State in the exercise of the rights, powers, and privileges of [FHFA]."). But the facts alleged in the shareholders' complaint show only that Treasury officials wanted FHFA to agree to the net worth sweep, not that Treasury directed or commandeered FHFA's exercise of its conservatorship powers. See Roberts, 889 F.3d at 406 ("Even if, as the complaint alleges, Treasury officials made statements suggesting that Treasury was in the driver's seat and had to convince [FHFA] to come along for the ride, such behavior alone would not violate section 4617(a)(7).").

§ 4617(f) (emphasis added). An injunction barring FHFA's counterparty (Treasury) from participating in the net worth sweep would plainly affect FHFA's ability (as conservator) to participate in the net worth sweep. See Roberts, 889 F.3d at 407; Robinson, 876 F.3d at 233–34; Perry Capital, 864 F.3d at 615–16. And, as we have already concluded FHFA did not exceed its authority in agreeing to the net worth sweep, we conclude that the anti-injunction provision applies and ends the case against Treasury.[7]

## III.

For these reasons, we affirm the district court's dismissal of the shareholders' suit.

STRAS, Circuit Judge, concurring.

The shareholders make a compelling case that the FHFA, created to stem the tide of a massive financial crisis, has grown into a monster. But judges are not superheroes; we cannot run to the rescue every time danger looms. Our job is to follow the law wherever it leads us. And here, the law leads to a single conclusion: the FHFA did not exceed its statutory powers by agreeing to the Net Worth Sweep, however troubling the scope of the Agency's powers and its willingness to seize them may be. I join the court's opinion and write separately to explain why.

This shareholder lawsuit crashes into a roadblock before it can get started. The Housing and Economic Recovery Act, the statute creating the FHFA, includes an anti-injunction provision that prohibits any judicial action "to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator or a receiver." 12

---

[7]Our determination that HERA's anti-injunction provision bars this suit means we need not address the parties' remaining arguments.

U.S.C. § 4617(f). The provision is broad but not boundless. As the court correctly concludes, it applies only when the FHFA has acted within the scope of its statutory powers and functions. The question here is whether agreeing to the Net Worth Sweep was an authorized act.

The answer depends on the precise language Congress used in granting the FHFA its powers, because an agency may only exercise those powers Congress has given it. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."). As relevant here, 12 U.S.C. § 4617 defines the FHFA's powers and functions as conservator. It does so in terms so broad that it authorizes the FHFA to do almost anything when it comes to Fannie and Freddie. Given this breadth, agreeing to the Net Worth Sweep fits within the scope of the Agency's powers.

Two provisions of section 4617 make this clear. The first provision, the operational powers, allows the FHFA to run Fannie and Freddie on a day-to-day basis. *See id.* § 4617(b)(2)(B). It "may, as conservator or receiver[,] . . . take over the assets of and operate the regulated entity with all the powers of the shareholders, the directors, and the officers of the regulated entity and conduct all business of the regulated entity." *Id.* § 4617(b)(2)(B)(i).

The second provision, the incidental powers, is what sets this scheme apart. A conservator is traditionally required to act in the best interests of its ward, period. *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 641 (D.C. Cir. 2017) (Brown, J., dissenting in part) (discussing the nature of a common-law conservator). But the incidental-powers provision allows the FHFA "as conservator or receiver . . . [to] take any action authorized by this section, which the [FHFA] determines is in the best interests of the regulated entity *or the [FHFA]*." 12 U.S.C. § 4617(b)(2)(J)(ii) (emphasis added). That is no typo. The FHFA can operate critically important businesses, with trillions of dollars in assets and the financial support of the federal

government, in its own best interests—apparently to the exclusion of the interests of the American people, Fannie and Freddie, and their shareholders.[8]

In setting up the scheme in the way that it did, Congress came close to handing a blank check to the FHFA. I cannot see how the Agency's exceptionally broad operational authority could exclude the power to renegotiate an existing lending agreement, which is in essence what the Net Worth Sweep did. Fannie and Freddie owed money; the Net Worth Sweep changed the payment schedule and terms. This sort of action is within the heartland of powers vested in the officers or board of directors of any corporation. *Accord Perry Capital*, 864 F.3d at 607.

To be sure, the Net Worth Sweep, as its name might suggest, forces the entities to relinquish all of their excess capital to the Department of the Treasury each quarter, leaving shareholders holding worthless stock. But whatever the harm to shareholders, the FHFA certainly considered the agreement to be in its own best interests, which is all that the incidental-powers provision requires. Congress charged the FHFA with ensuring that Fannie and Freddie continue "to accomplish their public mission[]" of "facilitat[ing] the financing of affordable housing for low- and moderate-income families." 12 U.S.C. § 4501(2), (7). The Net Worth Sweep advanced this goal by protecting the entities from future market downturns or full-fledged crises. *See Perry Capital*, 864 F.3d at 607.

---

[8]The delegation is more harrowing still. The President can only remove the FHFA's director for cause; Congress cannot control its budget through the normal appropriations process; and the judiciary cannot interfere with the exercise of its powers or functions as conservator. *See Collins v. Mnuchin*, No. 17-20364, 2018 WL 3430826, at *18 (5th Cir. July 16, 2018) (per curiam); *see also* 12 U.S.C. §§ 4512(b)(2), 4516(a), (f), 4617(f). But unlike the plaintiffs in *Collins*, the shareholders do not raise a constitutional challenge in this case. Rather, they ask us to decide only whether the FHFA has exceeded its statutory powers and functions.

Faced with exceptionally broad statutory language, the shareholders look long and hard for something—anything—to limit the FHFA's authority. They focus their efforts on the powers-as-conservator provision, which states that "[t]he Agency may, as conservator, take such action as may be . . . appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D)(ii). Relying on the overarching statutory structure and common-law understanding of what conservators do, the shareholders argue that the powers-as-conservator provision creates a mandatory duty to preserve and conserve assets. Their theory is that the Net Worth Sweep is antithetical to this duty.

The theory, though cleverly constructed, collapses on closer inspection. The powers-as-conservator provision uses "may . . . take such action" to introduce the supposed duty to preserve and conserve assets. Ordinarily, the word "may is permissive," while "shall is mandatory." Antonin Scalia & Bryan A. Garner, Reading Law 112–15 (2012) (emphasis omitted). The usages throughout section 4617 follow this general pattern. "Shall" appears over one hundred times, enumerating mandatory duties across an array of situations. *See, e.g.*, 12 U.S.C. § 4617(a)(4)(A)–(B), (D), (b)(2)(E). "May" appears over fifty times, primarily describing acts that are within the Agency's discretion. *See, e.g., id.* § 4617(b)(1), (2)(B), (G), (J), (7)(A)(iii). Under the whole-statute and consistent-usage canons, there is no reason to doubt that the powers-as-conservator provision uses "may" in its normal, permissive sense, consistent with the rest of the statute. *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (describing the "cardinal rule that a statute is to be read as a whole"); *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 584 (2007) (Thomas, J., concurring in part) (observing that there is a "presumption that the same words repeated in different parts of the same statute have the same meaning"). If "may" is permissive, as appears from the text of the powers-as-conservator provision, then the FHFA could not have acted outside of its authority by failing to do something that was optional in the first place.

But even assuming that a mandatory duty to preserve and conserve assets exists, the FHFA's decision to enter the Net Worth Sweep did not violate it. To "preserve" and "conserve" means to "keep from injury, peril, or harm" and "protect from loss or harm." *The American Heritage Dictionary of the English Language* 392, 1394 (5th ed. 2016). The essence of the shareholders' theory is that the FHFA had an overarching duty to protect Fannie's and Freddie's assets from injury, peril, loss, or harm. In the shareholders' view, the FHFA failed to do so.

Yet the duty is not as categorical as the shareholders seem to think. The powers-as-conservator provision says that the FHFA may "take such action as may be . . . appropriate to . . . preserve and conserve the assets and property of" Fannie and Freddie. 12 U.S.C. § 4617(b)(2)(D)(ii) (emphasis added). The word "appropriate," which means "[s]uitable for a particular person, condition, occasion, or place," *The American Heritage Dictionary of the English Language* 88 (5th ed. 2016), defines the range of "action[s]" the FHFA can take to fulfill the duty. Congress hardly could have picked a broader term. To fulfill the duty, all the FHFA must do is to take an action that is "suitable" for preserving and conserving assets. It need not pick the one the shareholders prefer or even the best alternative among a host of options.

It is clear that the choice among suitable alternatives belongs to the FHFA, not to the shareholders and certainly not to the courts. Recall that the incidental-powers provision allows it to "take any action authorized by [section 4617], which [it] determines is in the best interests of [Fannie or Freddie] or the [FHFA]." 12 U.S.C. § 4617(b)(2)(J)(ii). The first part of the incidental-powers provision defines its scope: it applies only to an "action authorized by" section 4617. *Id.* A mandatory duty to preserve and conserve assets would limit the range of permissible actions that the FHFA can take. But if there are multiple appropriate actions that would preserve and conserve assets in a given situation, then all of them would be authorized by section 4617. In those situations, the incidental-powers provision lets the FHFA choose among the appropriate actions based on Fannie's, Freddie's, or its own best

interests. The anti-injunction provision then takes center stage in any judicial challenge, insulating the FHFA's actions from judicial review so long as the FHFA has not exceeded its authority, such as by acting in a way that is not "suitable" for preserving and conserving assets or is not in the best interests of Fannie, Freddie, or itself.

The Net Worth Sweep was among a range of actions "suitable" for preserving and conserving assets, well within the discretion granted to the FHFA under the statute, even if the shareholders would have preferred a different course of action. The Net Worth Sweep benefitted Fannie and Freddie, most notably by providing immediate relief from having to pay $19 billion in fixed annual dividends and commitment fees. *See* Fannie Mae, Quarterly Report (Form 10-Q) 12 (Aug. 8, 2012), http://goo.gl/bGLVXz; Freddie Mac, Quarterly Report (Form 10-Q) 10 (Aug. 7, 2012), http://goo.gl/2dbgey. It also prevented Fannie and Freddie from entering potential death spirals. They were obligated to make dividend payments under the previous arrangement based on their amount of outstanding debt, so during lean years when they borrowed more money from the Department of the Treasury, their future dividend payments would grow. *See Roberts v. FHFA*, 889 F.3d 397, 404–05 (7th Cir. 2018). Crushing dividend payments could have led the entities toward insolvency. The shareholders do not dispute these benefits.

Rather, the shareholders fixate on the negative consequences of the Net Worth Sweep. The most serious negative consequence, at least from the shareholders' perspective, is that they can no longer share in Fannie's and Freddie's successes. Instead, both entities must pay out all excess capital on a quarterly basis to the Department of the Treasury, eliminating the possibility of shareholder dividends or the accumulation of capital by either entity. In addition to preventing the entities from accumulating capital, the Net Worth Sweep has resulted in the payment of more than $100 billion in additional dividends to Treasury, over and above what Fannie and Freddie would have paid under the previous arrangement. *See* FHFA, *Table 2:*

*Dividends on Enterprise Draws from Treasury*, https://goo.gl/vHl8V0.  It is hard to overstate the seriousness of the shareholders' concerns.

But entering into the Net Worth Sweep was the FHFA's call, not ours, no matter how much the shareholders disagree with the FHFA's decision.  Even accepting all of the shareholders' allegations as true does not negate the Net Worth Sweep's asset-preserving-and-conserving effects or take this action outside the broad discretion afforded to the FHFA under the Housing and Economic Recovery Act.  Picking among different ways of preserving and conserving assets, deciding whose interests to pursue while doing so, and determining the best way to do so are all choices that the Housing and Economic Recovery Act clearly assigns to the FHFA, not courts.

*          *          *

Congress, intentionally or otherwise, may have created a monster by handing an agency breathtakingly broad powers and insulating the exercise of those powers from judicial review.  Even so, clear statutory text dictates the outcome.  I accordingly concur.

_____