**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3794
_____

DAVID JACOBS; GARY HINDES,
                              Appellants

v.

FEDERAL HOUSING FINANCE AGENCY,
IN ITS CAPACITY AS CONSERVATOR OF THE
FEDERAL NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN MORTGAGE
CORPORATION;
UNITED STATES DEPARTMENT OF THE TREASURY;
FEDERAL NATIONAL MORTGAGE ASSOCIATION;
FEDERAL HOME LOAN MORTGAGE CORPORATION
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1:015-cv-00708)
District Judge: Honorable Gregory M. Sleet
_____

Argued September 7, 2018

Before: HARDIMAN, KRAUSE, and BIBAS, *Circuit Judges*

(Filed: November 14, 2018)
_____

Christopher N. Kelly, Esq.
Michael A. Pittenger, Esq.          [ARGUED]
Alan R. Silverstein, Esq.
Potter Anderson & Corroon
1313 North Market Street
6th Floor
Wilmington, DE 19801

Myron T. Steele, Esq.
Potter, Anderson & Corroon
800 North State Street
Suite 401
Dover, DE 19901
          *Counsel for Appellants*

David B. Bergman, Esq.
Howard N. Cayne, Esq.          [ARGUED]
Ian S. Hoffman, Esq.
Dirk Phillips, Esq.
Asim Varma, Esq.
Arnold & Porter Kaye Scholer
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001

Robert C. Maddox, Esq.
Robert J. Stearn, Jr., Esq.
Richards Layton & Finger
920 North King Street
One Rodney Square
Wilmington, DE 19801
        *Counsel for Appellee Federal Housing Finance Agency*

Gerard J. Sinzdak, Esq.            [ARGUED]
Abby C. Wright, Esq.
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
        *Counsel for Appellee United States Department of Treasury*

Robert C. Maddox, Esq.
Robert J. Stearn, Jr., Esq.
Richards Layton & Finger
920 North King Street
One Rodney Square
Wilmington, DE 19801

Meaghan M. Vergow, Esq.
O'Melveny & Myers
1625 I Street, N.W.
Washington, DC 20006
        *Counsel for Appellee Federal National Mortgage Association*

Michael J. Ciatti, Esq.
King & Spalding
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C. 20006

Robert C. Maddox, Esq.
Robert J. Stearn, Jr., Esq.
Richards Layton & Finger
920 North King Street
One Rodney Square
Wilmington, DE 19801
     *Counsel for Appellee Federal Home Loan Mortgage Corporation*

———————————

OPINION OF THE COURT
———————————

BIBAS, *Circuit Judge*.

In 2008, the U.S. government strove to rescue the collapsing economy. Its extreme measures helped many, but others suffered as a result. One of the rescue measures, the Housing and Economic Recovery Act, authorized the government to act as conservator for Fannie Mae and Freddie Mac, two government-sponsored enterprises with critical roles in the home-mortgage market. Under that conservatorship, Fannie and Freddie made a deal with the Department of Treasury. The deal guaranteed Fannie and Freddie access to hundreds of billions of dollars. But in return, they had to give their net profits to the

Treasury—in perpetuity. Fannie's and Freddie's junior shareholders had expected to share in those future profits, but the deal wiped out that expectation. So some of those junior shareholders now challenge that deal.

We reject the shareholders' challenge on all fronts. First, the Recovery Act gave the government broad, discretionary power to enter into the deal. Second, the deal complies with the requirements of the Recovery Act, as well as Delaware and Virginia corporate law. And third, the relief sought would "restrain or affect the exercise of [the government's] powers" as conservator, which the Recovery Act forbids. 12 U.S.C. §4617(f). That relief, even the monetary relief, would unwind the whole deal. So we will affirm the District Court's dismissal.

## I. BACKGROUND

### A. Statutory framework

1. *Fannie Mae and Freddie Mac.* In the wake of the Great Depression, Congress created Fannie, and later Freddie, to support the home-mortgage market. Pub. L. No. 91-351, 84 Stat. 450, §301(b), *as amended by* Pub. L. No. 101-73, 103 Stat. 183, §731(a) (codified at 12 U.S.C. §1451 note) (Freddie Mac); 12 U.S.C. §§1716-17 (Fannie Mae). Fannie and Freddie do so by borrowing money, buying home mortgages, packaging them into guaranteed mortgage-backed securities, and selling those securities to investors. 12 U.S.C. §§1454-55, 1719.

By buying mortgages and then guaranteeing the resulting securities, Fannie and Freddie make the mortgage market both more liquid and more stable. *Perry Capital LLC v. Mnuchin*,

5

864 F.3d 591, 599 (D.C. Cir. 2017) (*Perry Capital*), *cert. denied*, 138 S. Ct. 978 (2018). They relieve mortgage lenders of the risk of default and free up their capital to make more loans. As a result, lenders can keep lending to home buyers who meet Fannie's and Freddie's underwriting standards, secure in the knowledge that Fannie and Freddie will buy those mortgages. By 2008, Fannie and Freddie owned or guaranteed *five trillion* dollars' worth of mortgages and mortgage-backed securities—nearly half of the market. *Id.* In short, they are the backbone of the U.S. residential-mortgage market.

Fannie and Freddie are government-sponsored enterprises; they were created by congressional charter but are owned by private shareholders. 2 U.S.C. § 622(8). Although Fannie and Freddie are privately owned and publicly traded companies, the public has long viewed their securities as implicitly backed by the federal government's credit. That perceived government guarantee has helped them to borrow money and to buy mortgages more cheaply than they otherwise could have. *Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208, 215 (D.D.C. 2014), *aff'd in part*, 864 F.3d 591. All that borrowing, lending, and buying propelled the housing market to record highs by the mid-2000's.

2. *The Housing and Economic Recovery Act of 2008.* Then the housing bubble burst. House prices plunged, slashing the value of Fannie's and Freddie's mortgage portfolios. Fannie's and Freddie's guarantees put them on the hook not only for the mortgages they owned, but also for many mortgage-backed securities based on loans gone bad. Congress feared that they might default, threatening not only the housing market but the

6

precarious national economy as a whole. *Perry Capital*, 864 F.3d at 599.

To ward off that threat, Congress passed the Recovery Act. The Recovery Act created the Federal Housing Financing Agency and empowered it to supervise and regulate Fannie and Freddie. 12 U.S.C. § 4511. The Recovery Act gives the Agency many enumerated, mostly discretionary powers. For instance, it authorizes the Agency's Director to "appoint the Agency as conservator … for the purpose of reorganizing [or] rehabilitating … the affairs of" Fannie or Freddie. *Id.* § 4617(a)(1)-(2). As conservator, the Agency inherits all the "rights, titles, powers, and privileges" of Fannie, Freddie, and their officers, directors, and shareholders. *Id.* § 4617(b)(2)(A)(i). The Recovery Act also authorizes the Agency as conservator to exercise any "incidental powers as shall be necessary to carry out [its enumerated] powers." *Id.* § 4617(b)(2)(J)(i).

3. *Section 4617(f) of the Recovery Act*. Having given the Agency sweeping authority and discretion, the Recovery Act strictly limits judicial review: "[N]o court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or receiver." *Id.* § 4617(f). This case turns in part on how to interpret and apply that subsection.

## B.  Factual background

In 2008, the collapse of the housing market cost Fannie and Freddie billions of dollars, threatening the U.S. mortgage market. The Treasury quickly took steps to prop up Fannie and

7

Freddie. But the mortgage and financial markets remained perilous, and the financial crisis grew worse. So the Agency put both Fannie and Freddie into conservatorship.

Under the Agency's direction, they entered into funding agreements with the Treasury. The Treasury gave each enterprise a funding commitment. When Fannie's or Freddie's liabilities exceed their assets, they can draw on that funding commitment to keep their net worth in the black.

In return, the Treasury received one million shares of senior preferred stock in each of Fannie and Freddie. These shares gave the Treasury a liquidation preference in each enterprise equal to $1 billion plus all the money drawn from the Treasury's funding commitment. The shares also gave the Treasury an annual dividend equal to 10% of the liquidation preference, if paid in cash.

The Treasury initially capped its funding commitment at $100 billion per enterprise. That was not enough, at least for Fannie. Two amendments to the funding agreement more than doubled that cap, and Fannie and Freddie wound up drawing $116.1 billion and $71.3 billion from the Treasury. But as Fannie and Freddie drew more and more money from the Treasury, they owed it larger and larger dividends. In a vicious cycle, they sometimes had to draw money from the Treasury just to pay the Treasury's dividends.

In 2012, the Treasury and the Agency renegotiated the funding agreements and agreed to the Third Amendment. The Third Amendment replaced the 10% annual dividend with a quarterly variable dividend. It set that variable dividend equal

8

to Fannie's and Freddie's positive net worth above a capital buffer, which was set to decrease with each dividend payment. The capital buffer is now down to zero. So each quarter, the dividend consumes each enterprise's entire positive net worth. The challengers call this arrangement the Net Worth Sweep.

In other words, under the Third Amendment, if Fannie or Freddie has a positive net worth, it pays all that worth out as a dividend to the Treasury. If its net worth is zero or negative, it pays nothing. Fannie and Freddie pay only what they can. That way, they need never again draw from the Treasury to pay the Treasury's dividends. But they also have no money left over to pay dividends to junior shareholders or to redeem the Treasury's shares, exit conservatorship, and return to private control.

### C. Procedural history

David Jacobs and Gary Hindes filed this class-action suit against the Agency, Treasury, Fannie, and Freddie to challenge the Third Amendment. Their original complaint asserted claims for breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and violations of Delaware and Virginia corporate law.

The challengers later amended their complaint, voluntarily dismissing their claims for breach of contract, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing. The amended complaint contains four counts: two asserting that the Third Amendment violates Delaware and Virginia corporate law, and two new claims against the Treasury for unjust enrichment. It seeks declaratory, injunctive, and

9

monetary relief, including damages, restitution, and disgorgement.

The Agency, Treasury, Fannie, and Freddie moved to dismiss. The District Court granted that motion, holding that 12 U.S.C. §4617(f) barred all the challengers' claims. *Jacobs v. FHFA*, No. 15-708-GMS, 2017 WL 5664769, at *1 (D. Del. Nov. 27, 2017). It reasoned that the Agency acted within its statutory powers, that the Recovery Act did not incorporate state law, and that §4617(f)'s "sweeping limitations … on judicial review" deprived it of jurisdiction. *Id.* at *3-5. The court also refused to take judicial notice of certain documents that allegedly undermined the Agency's and Treasury's assertions, because it did not rely on those assertions in reaching its decision. *Id.* at *7.

This appeal followed. Like the District Court, we do not rely on those assertions, so we will affirm the refusal to take judicial notice of the challengers' documents. We review the District Court's dismissal de novo. *Hindes v. FDIC*, 137 F.3d 148, 153 (3d Cir. 1998).

## II. THE RECOVERY ACT EMPOWERED THE AGENCY TO ENTER INTO THE THIRD AMENDMENT

Section 4617(f) bars claims when 1) the government acts as a conservator, 2) it does not exceed its statutory authority, and 3) the remedy sought would affect the exercise of that authority. So to figure out whether §4617(f) bars the challengers' claims, we first identify "the powers or functions of the Agency as a conservator." In this part of the opinion, we hold that the Act empowers the Agency to enter into the Third Amendment.

In Part III, we go on to hold that the Third Amendment does not contravene any other limitations in the Recovery Act. And in Part IV, we hold that the relief requested by the challengers would "restrain or affect" the Agency's exercise of its powers. So the District Court properly dismissed this suit.

The Recovery Act defines the Agency's "powers … as a conservator." 12 U.S.C. §4617(f). Those powers are many and mostly discretionary, including:

- the power to take over Fannie's and Freddie's assets. *Id.* §4617(b)(2)(B)(i).

- the power to operate Fannie and Freddie, using all of the officers', directors', and shareholders' powers. *Id.*

- the power to "preserve and conserve" Fannie's and Freddie's assets. *Id.* §4617(b)(2)(B)(iv).

- the power to "take such action as may be … necessary to put [Fannie and Freddie] in a sound and solvent condition," and appropriate to carry on their business. *Id.* §4617(b)(2)(D).

These powers authorized the Agency to enter into the Third Amendment. To begin, the Third Amendment is an exercise of the Agency's power to take over Fannie and Freddie's assets and operate their businesses. *Id.* §4617(b)(2)(B)(i). To operate their businesses, Fannie and Freddie must secure ongoing access to capital, manage debt loads, control cash flow, and decide whether and how to pay dividends. *Perry Capital*, 864

11

F.3d at 607. The Third Amendment is in essence a renegotiation of an existing lending agreement (albeit with equity rather than debt). *Saxton v. FHFA*, 901 F.3d 954, 960-61 (8th Cir. 2018) (Stras, J., concurring). That is a traditional power of corporate officers or directors. *Id.* And the Agency, as conservator, inherits those powers. 12 U.S.C. § 4617(b)(2)(B)(i).

Next, the Third Amendment falls within the Agency's power to "preserve and conserve [Fannie's and Freddie's] assets" and to do what is "necessary to put [Fannie and Freddie] in a sound and solvent condition." 12 U.S.C. § 4617(b)(2)(B)(iv), (D)(i). The Agency "may" exercise those powers "as appropriate," so we ask only whether the Agency picked a suitable action, not the best alternative. *Saxton*, 901 F.3d at 961–62 (Stras, J., concurring).

Before the Third Amendment, the challengers admit, Fannie and Freddie sometimes had to draw funds from the Treasury just to pay the Treasury's dividend. App. 51-52. That dug Fannie and Freddie deeper and deeper into the hole, increasing their future dividend obligations while also reducing their available funds. "The Third Amendment permanently eliminated" that Catch-22, as well as the associated "risk that cash-dividend payments would consume [Fannie's and Freddie's] lifeline." *Roberts v. FHFA*, 889 F.3d 397, 404-05 (7th Cir. 2018). So the Agency could reasonably conclude that the Third Amendment would "preserve and conserve [Fannie's and Freddie's] assets" in the long run, putting them on a "sound and solvent" footing. 12 U.S.C. § 4617(b)(2)(B)(iv), (D)(i).

Any of these powers alone would have authorized the Agency to enter into the Third Amendment. Indeed, every federal court of appeals to address this issue has held that adopting the Third Amendment "falls within [the Agency's] statutory conservatorship powers." *Perry Capital*, 864 F.3d at 606; *accord Saxton*, 901 F.3d at 959; *Collins v. Mnuchin*, 896 F.3d 640, 653 (5th Cir. 2018); *Roberts*, 889 F.3d at 403; *Robinson v. FHFA*, 876 F.3d 220, 232 (6th Cir. 2017). We agree. The Recovery Act empowered the Agency to enter into the Third Amendment.

## III. THE THIRD AMENDMENT IS CONSISTENT WITH THE RECOVERY ACT'S LIMITATIONS

The Third Amendment does not violate any other provision of the Recovery Act. The challengers assert that it violates Delaware and Virginia corporate law, as supposedly incorporated by two provisions of the Recovery Act (known as the succession clause and the repudiation-of-contracts clause). They also assert that it violates the Act's liquidation-of-assets procedures and its alleged requirement to serve Fannie's and Freddie's interests, rather than the government's. But that is not so.

### A. The Recovery Act's provisions supposedly incorporating Delaware and Virginia law

Federal regulation required each enterprise to pick a state's laws for its corporate governance. 12 C.F.R. § 1239.3(b)(1). Fannie chose Delaware law; Freddie chose Virginia law. The chosen state's laws govern each enterprise to the extent that they are consistent with the enterprise's authorizing statute and other federal law. *Id.*

13

The challengers contend that the Recovery Act's succession clause and repudiation-of-contracts clause incorporate and require the Agency to follow Delaware and Virginia corporate law. So, they reason, if the Agency violates those laws, it also violates the Recovery Act itself. Because the Agency supposedly violated Delaware and Virginia law, it violated the Act itself and acted ultra vires. The Agency responds that the Recovery Act does not incorporate those state-law requirements and that, even if it did, they would be preempted.

The challengers' argument fails because the Third Amendment is consistent with both states' laws. So we need not decide whether and to what extent the Act itself requires the Agency to follow Delaware and Virginia law. We also need not decide whether federal law preempts these states' laws.

1. *The Third Amendment complies with Delaware law.* The challengers claim that the Third Amendment does not specify a rate at which to pay the Treasury's dividend. They also claim that it does not pay the Treasury in preference to or in relation to other classes of shareholders. Both arguments miss the mark.

a. *The dividend rate.* Delaware's corporate law entitles "holders of preferred or special stock … to receive dividends at such rates … as shall be stated in the certificate of incorporation or in the [board] resolution or resolutions providing for the issue of such stock." Del. Code Ann. tit. 8, § 151(c) (2017). The Treasury receives all of Fannie's and Freddie's positive net worth in perpetuity, the challengers argue, not just a specified dividend rate.

14

But the Third Amendment does specify a rate: 100%. The challengers cite no Delaware authority holding this rate unlawful. So the rate argument fails.

b. *The dividend preference*. That same provision of Delaware law authorizes dividends "payable in preference to, or in such relation to, the dividends payable on any other class … of stock." *Id.* The challengers claim that the Third Amendment does not create a preference, but rather permanently eliminates all other shareholders' dividends. And it cannot be payable in relation to another dividend that does not exist.

This argument fails too. The Treasury's dividend is payable in preference to all other classes of stock. It is always paid first and with all available funds. The challengers cite no Delaware authority suggesting that this preference is unlawful or that it must reserve funds to pay junior stockholders. Indeed, § 151 contemplates that preferred shareholders' dividends may absorb all funds and leave none for junior shareholders: once preferred dividends have been paid out "to the extent of the preference, … a dividend on the remaining class or classes or series of stock *may* then be paid out of the *remaining* assets of the corporation available for dividends." *Id.* (emphases added). So common shareholders are not guaranteed dividends. They may receive the dividends only if the board approves, only if preferred shareholders are paid, and only if assets remain available for dividends. Here, after paying the Treasury's dividend, no assets remain. So even if Delaware law applies, the Third Amendment complies with it.

2. *The Third Amendment complies with Virginia law.* The challengers reiterate their dividend-preference argument for

15

Freddie, this time under Virginia law. Virginia statutory and case law, they argue, forbids the Third Amendment's preferred-dividend arrangement.

Virginia law authorizes corporations to issue classes of stock that have preference over other classes. Va. Code Ann. §13.1-638(C)(4) (West 2018). The challengers again claim that the Treasury does not merely have a preference, but excludes other classes of stock entirely. But that is a preference, just an extreme one. Nothing in the statute forbids that preference.

The challengers also rely on two century-old Virginia cases. One of them described the "common understanding" that preferred shareholders get first dibs on earnings through "limited dividends," while common shareholders get the "hope of unlimited gain" through the company's "surplus profits." *Johnson v. Johnson & Briggs, Inc.*, 122 S.E. 100, 103 (Va. 1924). But a "common understanding" is not a rigid rule. And nothing about this case is "common." Fannie and Freddie are public-private entities in conservatorship under an intricate statutory scheme tailored to respond to an economic catastrophe. The ordinary case does not control.

The challengers' other case is likewise inapt. That case held that a corporation may not agree to pay preferred dividends when it lacks earnings with which to pay them. *Drewry, Hughes Co. v. Throckmorton*, 92 S.E. 818, 819 (Va. 1917). But the Third Amendment abides by this rule. Fannie and Freddie pay Treasury a dividend only when they have funds to pay.

16

In short, the Third Amendment comports with both Delaware's and Virginia's laws. No authority even puts the matter in doubt, so we see no need to certify the issues to the Delaware or Virginia Supreme Court. The challengers' claims under the Recovery Act's succession and repudiation-of-contracts clauses fail. *See Fairholme Funds, Inc. v. FHFA*, Nos. 13-1053, 13-1439, 13-1288, 2018 WL 4680197, at *17 (D.D.C. Sept. 28, 2018).

## B. The Recovery Act's priorities for liquidating assets

Next, the challengers argue that the Third Amendment violates the Recovery Act's specified priorities for distributing assets on liquidation, codified at 12 U.S.C. § 4617(b)(3)-(9), (c). As common shareholders, the challengers would have had certain claims upon Fannie's and Freddie's assets if the enterprises had been put into liquidation. But as the District Court explained, these provisions do not apply because neither Fannie nor Freddie is in liquidation. *Jacobs*, 2017 WL 5664769, at *6.

*Perry Capital* is not to the contrary. Though it allowed a liquidation-preferences claim to go forward, it did so because the stock certificates themselves guaranteed a liquidation preference. The wording of the certificates gave the plaintiffs there a claim for anticipatory breach of contract. *Perry Capital*, 864 F.3d at 632-33.

But here, there is no claim that the stock certificates create a liquidation priority; the challengers' liquidation claim rests entirely on the Recovery Act. And the challengers voluntarily dismissed their breach-of-contract claim. So *Perry Capital* is inapt.

17

**C. The Agency's multiple constituencies and additional powers**

The challengers next assert that the Agency as conservator should have focused solely on maximizing Fannie's and Freddie's financial returns. They charge the Agency with "acting in Treasury's interest, and not [Fannie's and Freddie's] interest, and acting in a manner [in which Fannie and Freddie] themselves had no power to act, when implementing the" Third Amendment. Jacobs Br. 49. But the Recovery Act authorizes the Agency to do just that.

1. *The Agency's multiple constituencies*. When the Agency acts as conservator, it need not act solely in Fannie's and Freddie's interests, as a traditional conservator would. It may also act to protect its own interests and those of the public.

At common law, a conservator could not "act[ ] for the benefit of [himself] or a third party." *Perry Capital*, 864 F.3d at 641 (Brown, J., dissenting). But the Agency is no "common-law conservator." *Id.* at 613 (majority opinion). The Recovery Act authorizes the Agency to use its powers as conservator in whatever way it "determines is in the best interests of [Fannie or Freddie] *or the Agency*." 12 U.S.C. § 4617(b)(2)(J)(ii) (emphasis added). As the D.C. Circuit explained, this provision reflects Congress's "deliberate choice" to let the Agency "act in its own best governmental interests, which may include the taxpaying public's interest." *Perry Capital*, 864 F.3d at 608.

That authorization implements the Recovery Act's mandate that the Agency "ensure that" Fannie and Freddie "operate[ ] [in a manner] consistent with the public interest." 12 U.S.C.

18

§ 4513(a)(1)(B), (B)(v). In the same vein, the Act instructs the Treasury not to buy Fannie's and Freddie's securities unless doing so would "provide stability to the financial markets" and "protect the taxpayer." *Id.* §§ 1455(*l*)(1)(B)(i), (iii), 1719(g)(1)(B)(i), (iii).

While the Agency must consider the public interest, it need not consider the interests of Fannie's and Freddie's shareholders. That becomes clear when we compare the Recovery Act with its predecessor. Much of the Recovery Act is closely patterned on an earlier financial-institution-rescue law, the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA). For instance, the Recovery Act's limitation on judicial review is copied almost verbatim from the one in FIRREA. *Compare id.* § 4617(f), *with id.* § 1821(j). Because "Congress use[d] the same language in two statutes having similar purposes," we "presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005). So our sister courts of appeals all interpret § 4617(f) by looking to their precedents on § 1821(j). *See, e.g.*, *Perry Capital*, 864 F.3d at 605-06; *Robinson*, 876 F.3d at 227; *Roberts*, 889 F.3d at 402. We will too.

FIRREA permits the Federal Deposit Insurance Corporation to act as conservator "in the best interests of the [bank], *its depositors*, or the [FDIC]." 12 U.S.C. § 1821(d)(2)(J)(ii) (emphasis added). So the FDIC could take into account the interests of depositors. But the Recovery Act omits the analogue of depositors—shareholders—from its list, referring only to the best interests of Fannie, Freddie, and the Agency. *Id.*

19

§4617(b)(2)(J)(ii); *see Perry Capital*, 864 F.3d at 608. Particularly because Congress modeled the Recovery Act on FIRREA, the Recovery Act's omission of shareholders' interests is telling. In short, the Agency is supposed to act in its own interests (which reflect the interests of the government and the public), *not* in the interests of Fannie's and Freddie's shareholders.

The Third Amendment thus threw Fannie and Freddie a $200-billion-plus lifeline to safeguard not just their own interests, but also the government's and the public's interests. These other constituencies benefit from a risk-averse approach. Even if the economy collapses again, the Agency, the government, and the public will be assured that Fannie and Freddie can continue to stabilize the housing market.

The Third Amendment also serves Fannie's and Freddie's own interests. They did not give away their future net worth for nothing. In consideration, the Treasury gave up its right to an unconditional 10% dividend, which sometimes cost Fannie and Freddie more than their positive net worth and forced them to borrow even more. The Third Amendment thus insured Fannie and Freddie against downturns and "death spirals," preventing unpayable dividends from ratcheting up their debt loads to unsustainable levels. *Saxton*, 901 F.3d at 962 (Stras, J., concurring).

2. *The Agency's powers extend beyond Fannie's and Freddie's powers.* Finally, it does not matter if the Agency acted in a way that Fannie and Freddie could not have. The Recovery

20

Act gave the Agency not only powers inherited from those enterprises, but also a host of other powers. And the Agency acted within those statutory powers.

## IV. SECTION 4617(f) BARS THE REQUESTED RELIEF

The Recovery Act empowered the Agency to enter into the Third Amendment. And the Third Amendment does not violate any of the Recovery Act's limitations. So entering into the Third Amendment was a legitimate exercise of the Agency's powers as conservator.

The only remaining issue is whether the challengers' requested relief would "restrain or affect the exercise of [the Agency's] powers … as a conservator." 12 U.S.C. §4617(f). The challengers concede that it would. And §4617(f) applies to all forms of relief that would do so, not just injunctions or equitable relief. So that subsection bars all the relief requested here.

### A. The challengers concede that they seek to undo the Third Amendment

At oral argument, the challengers admitted that the relief they seek would undo the entire Third Amendment. They would have us void it and force the Treasury to disgorge all the dividends that it received under the Third Amendment. Undoing the Third Amendment would restrain the Agency's powers. So the challengers' concession dooms their case.

21

**B. Section 4617(f) applies to monetary relief that would restrain or affect the exercise of the Agency's powers as conservator**

The challengers argue, however, that their concession does not bar their claims for monetary relief. They claim that §4617(f) applies only to "equitable and injunctive relief," not damages claims. Appellants' Br. 41-43. They even call that subsection an "anti-injunction clause." *Id.* at 19. But that label is inaccurate.

Their argument has some support. Some courts of appeals likewise call §4617(f) an "anti-injunction" clause. *E.g.*, *Saxton*, 901 F.3d at 957; *Robinson*, 876 F.3d at 227. And some interpret §4617(f) as barring only equitable relief, not damages claims. *E.g.*, *Saxton*, 901 F.3d at 957; *Perry Capital*, 864 F.3d at 606, 613-14.

We decline to adopt this interpretation for two reasons. First, the text of §4617(f) is not limited to declaratory, injunctive, or other equitable relief. Second, our FIRREA precedent suggests that §4617(f) also bars some monetary claims.

1. *The text of §4617(f) extends to monetary relief*. Section 4617(f) reads, in full: "Except as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver."

Nothing in that text refers to the type or form of remedy a plaintiff seeks. It says nothing about law versus equity or damages versus injunctions. Rather, the text forbids courts to take

"any action" that seeks to "restrain or affect" the Agency's exercise of its powers as conservator. The focus is not on the *form* of requested relief, but its *effect*. If monetary relief would have that effect, then it is barred. If not, then it is permitted.

2. *Our FIRREA precedent supports applying § 4617(f) to some monetary relief*. That interpretation accords with our cases interpreting FIRREA's parallel provision. In *Rosa v. Resolution Trust Corp.*, we held that § 1821(j) barred monetary relief granted as part of an injunction. 938 F.2d 383, 399 (3d Cir. 1991). We did not rely on the equitable nature of the relief. What mattered was that the relief would have impeded the Resolution Trust Corporation's powers as "conservator promptly to perform its important functions in dealing with the savings and loan crisis." *Id.* The plaintiffs were limited to seeking a "remedy that would not 'restrain or affect' the exercise of the receiver's or conservator's powers or functions." *Id.*

Our later precedent continued to apply *Rosa*'s approach. *Hindes*, for example, recognized that § 1821(j) leaves open "a judicial remedy for an *appropriate* damages claim." 137 F.3d at 161 (emphasis added). But not all damages claims are appropriate. Courts have suggested that appropriate damages claims might include constitutional claims, breach-of-contract claims, claims authorized by FIRREA or the Recovery Act through the administrative process, claims based on ultra vires Agency action, and other damages claims that do not restrain or affect the Agency's exercise of its authorized powers. *See id.* (constitutional claims); *Perry Capital*, 864 F.3d at 614 (same, as well as breach of contract); *Saxton*, 901 F.3d at 960 n.8 (Stras, J., concurring) (constitutional challenges to the

23

Agency's structure); *Collins*, 896 F.3d at 659 (same); *Gross v. Bell Sav. Bank Pa SA*, 974 F.2d 403, 407-08 (3d Cir. 1992) (administrative claims authorized by FIRREA and claims of ultra vires agency action); *Rosa*, 938 F.2d at 399 (other claims that would not restrain or affect the exercise of authorized powers).

Here, the challengers' claims fall into none of these categories. They are not constitutional. They have not gone through the Recovery Act's administrative process. They do not flow from ultra vires agency action. And they are not claims for breach of contract.

Their claims would also restrain or affect the Agency's exercise of its statutory powers. The Recovery Act empowered the Agency to enter into the Third Amendment. And all parties agree that §4617(f) bars declaratory and injunctive relief. But granting the challengers' claims for damages, restitution, or disgorgement would require us to find the Third Amendment unlawful. The challengers cannot evade the bar on declaratory relief by asking for such a declaration as the basis for awarding damages. No matter how we label the relief, striking down the Third Amendment would interfere with the Agency's exercise of its powers as conservator.

Even apart from the declaratory aspect, awarding monetary relief would restrain or affect the Agency's conservatorship. The request for damages, disgorgement, and restitution, against both the Agency and the Treasury, would (as the challengers concede) unravel the Third Amendment, reverse the monetary payments made under it, and prevent or at least deter the Agency from implementing it further. Those are the same

consequences that would flow from granting an injunction or a declaratory judgment. So the monetary relief sought here would restrain or affect the exercise of the Agency's powers as conservator. All of it is barred by § 4617(f).

* * * * *

The challengers are in an unfortunate spot. They invested in Fannie and Freddie, expecting regular dividend payments in return. The Third Amendment destroyed those expectations.

But the Recovery Act is clear. It empowered the Agency to enter into the Third Amendment. That deal complies with Delaware law, Virginia law, and the Recovery Act itself. And the challengers' requested relief would effectively unwind the Third Amendment. Doing so would restrain or affect the Agency's exercise of its powers as conservator.

This we cannot do. So we will affirm.